Opinion issued March 26, 2009











 



 


    





In The
Court of Appeals
For The
First District of Texas
____________

NO. 01-07-00481-CV
____________

SCOTT WASHBURN, Appellant

V.

BRYAN SIMS AND ASTOUNDING PARTY RENTALS, INC., Appellees




On Appeal from the County Civil Court at Law No. 1
Harris County, Texas
Trial Court Cause No. 858,470



 
MEMORANDUM OPINION

          Appellant, Scott Washburn, appeals the judgment rendered against him in a
suit for a balance due on an open account and unjust enrichment against appellees,
Bryan Sims and Astounding Party Rentals, Inc. (APR)


 and on a counterclaim for
breach of contract brought against him by Sims. We determine whether the
evidence was legally and factually sufficient to support the jury’s findings that (1)
Washburn and Sims had an agreement for Washburn to purchase 51% of APR for
$279,795, (2) Sims was excused from performing under an agreement requiring
that he repay $20,000 to Washburn in the event that the sale of 51% of APR was
not completed by March 15, 2005, and (3) Sims was entitled to $36,000 in
damages because of Washburn’s failure to comply with their agreement.
          We reverse the judgment and render judgment in favor of Washburn.
Background
          In 2004, Sims was the owner of APR. In the fall of 2004, he was
approached by Washburn, a good friend, regarding the possibility of Washburn’s
investing in Sims’s business. APR was struggling due to increased competition,
and Sims was eager for an infusion of capital, new marketing ideas, and access to
new markets that he thought that Washburn could provide. After several informal
meetings, Sims and Washburn agreed to go forward with a deal in which
Washburn would purchase 51% of APR. Sims valued 51% of his business at
$279,795. On November 2, 2004, Sims and Washburn met with Chris Cammack,
an attorney, regarding the intended purchase. Cammack’s invoice for this meeting
stated that he met with Sims and Washburn to discuss “their objectives.”
          Following this meeting, the parties had a formal appraisal of the equipment
owned by APR conducted, and a report confirming the value of APR’s equipment
at $220,030 was faxed to Sims and Washburn on November 12, 2004. On
November 16, 2004, Louise Brock, Sims’s mother and business associate, called
Cammack to inform him that the appraisal had been received and that Sims and
Washburn wanted to close on their buy-sell agreement by Thanksgiving. Two
days later, on November 18, 2004, Sims called Cammack regarding the dollar
figures that he believed were agreed upon between himself and Washburn and the
document that they wanted him to draft. Sims scheduled a meeting with Cammack
for November 22, 2004. At the November 22, 2004 meeting, Washburn and Sims
both met with Cammack, and Cammack’s invoice reflects that he prepared
documents including various corporate documents and a buy-sell agreement
between Sims and Washburn.
          Throughout the fall of 2004, Washburn became involved in running the
business with Sims and Brock. Washburn had business cards printed, encouraged
Sims and Brock to form a new corporation, conducted sales calls, developed and
began implementing a new marketing strategy, and conducted other business
activities like looking at properties for a new warehouse location. Sims incurred
over $8,000 in expenses in October and November as a result of contracting for
new yellow pages adds and paying for appraisal fees and attorney’s fees.
          On January 6, 2005, Washburn and Sims received the “Agreement for the
Sale of Corporate Assets and Stock” that Cammack had drafted for them. The
agreement listed the total purchase price as $279,795, calculated as follows:
∙        $110,015 for an undivided 50% interest in all items of
inventory;
 
∙        $44,280 for an undivided 50% interest in all stocked items and
prepaid advertising;
 
∙        $100,000 for goodwill; and
 
∙        $25,500 for acquiring 51%, representing a majority interest.
 
This document was never signed by both parties. Nevertheless, on January 6,
2005, Washburn paid $5,000 to Sims to be used for the expenses of APR. On
January 13, 2005, Washburn paid another $5,000 to Sims to be used for APR. 
          On January 18, 2005, Washburn had the appraisers conduct a visual
inspection of APR’s equipment and received another report confirming the value
of APR’s equipment. Washburn also began seeking more detailed financial
information on APR from Brock. On February 3, 2005, Washburn emailed Brock
asking for 2004 balance sheets, income statements, accounts payable and
receivable, ledgers, spreadsheets, bank statements, outstanding loans to and from
Sims, and a “list of all advertising contracts including dates of renewal, pricing,
prepaid, etc.” Washburn also sought information on other prepaid items such as
insurance, rent, loans, a list of current and past due bills, the estimated sales
forecast and current bookings for 2005, and any other information about expenses
coming up in 2005 that Brock felt that he should know about. Brock sent a reply
email to Washburn on February 4, 2005 and attached the requested information.
          On February 7, 2005, Sims asked Washburn for another $10,000. Washburn
faxed him a letter of intent that was dated January 8, 2005. The cover letter sent
with the faxed letter of intent stated:
Please sign this Letter of Intent and fax [it] back to me . . . . I’ll wire
the $10,000 into your account today when I get it back. Review this
purchase agreement in the next few days and lets [sic] plan to finalize
it by next week with Jack and the following week with the attorney.
 
Next to the sentence about the purchase agreement was the notation “sending in a

few minutes.” The letter of intent itself stated:
This letter confirms our intentions with respect to my purchase of
51% of Astounding Party Rentals, Inc.
 
We envision that the principal terms of the proposed transaction
would be substantially as follows:
 
          a. 51% of all assets and inventory
          b. 51% of all prepaid insurance, advertising, rent, etc.
          c. Set amount of goodwill
          d. Due diligence review of all financial accounting and business
records, contracts, and other legal documents. Any information
obtained will be confidential
          e. A definitive purchase agreement will be negotiated and
executed between us
          f. You and I will pay our respective expenses relative to this
purchase.
          g. $10,000 of earnest money will be paid in January 2005 and
$10,000 additional earnest money will be paid on or before February
9, 2005. This money will be applied to the balance owed in the event
the purchase takes place or returned by July 1, 2005 if an agreed upon
price cannot be negotiated or the sale is not executed before March 15,
2005.
 
Sims added his signature to Washburn’s on the bottom of the letter of intent and
faxed it back to him immediately. Approximately ten minutes later, Washburn
faxed the purchase agreement. This purchase agreement was substantially similar
to the agreement drawn up by Cammack except for the terms of price and payment
schedule. Washburn’s purchase agreement listed the purchase price as $113,534,
calculated as follows:
∙        $99,740 for an undivided 50% interest in all items of inventory;
∙        $6,617 for an undivided 50% interest in all stocked items and
prepaid advertising;
 
∙        $5,000 for goodwill; and
 
∙        $2,177 for acquiring 51%, representing a majority interest.
 
When Sims received this purchase agreement, he immediately called Washburn to
ask why the agreement had been changed to reduce the sale price by half. 
Washburn purportedly told Sims not to worry about it and that they would work
something out.
          On February 8, 2005, Washburn wired $10,000 to Sims’s account, and Sims
wrote a check for $5,000 for insurance coverage obtained at Washburn’s request. 
On February 15, 2005, Washburn replied to Brock’s email of February 4, 2005
regarding the financial documents that she had sent and requested a few additional
items, including any remaining 2004 expenses, a copy of all current advertising
contracts, a copy of all current and pending customer contracts for 2005, and a list
of all current and outstanding bills.
          On February 16, 2005, Washburn and Sims conducted a brief conference
call with Cammack informing him that they were forming a new corporation
through their accountant, Jack Wyrick. Cammack confirmed with Wyrick that he
prepared only the articles of incorporation and obtained a new federal tax
identification number and that no by-laws or shareholder’s agreement had been
prepared. On February 22, 2005, Sims filed the necessary paperwork to form the
new corporation as envisioned by himself and Washburn. The articles of
incorporation for APR listed Washburn and Sims as the only two directors. No
assets were ever transferred into this corporation.
          Washburn sent another email to Brock on February 23, 2005 informing her
that he was “[a]lready working on the Target Markets we are going to hit. Should
have it done early next week along with some other Sales/Marketing plans.” Brock
and Sims met on March 1, 2005 for a “brainstorming” session in which they
discussed marketing strategy and other aspects of the business.
          During this time, Sims and APR continued to incur expenses with
Washburn’s involvment, including an additional $7,822 for liability insurance,
$15,464 for equipment repair and maintenance, $39,278.40 for the purchase of a
new truck, and several thousand dollars for advertising. Eventually, the March 15,
2005 deadline for completing the sale of 51% of APR passed, and the sale was
never completed.
          On May 19, 2005, Washburn sent a letter requesting that the following sums
be repaid:
•        $80 for annual dues paid to the International Special Events and
Recreation Association (ISERA),
 
•        $5,371.86 for the first insurance premium payment to ISERA,
•        $500 for Sims’s half of the Wyrick’s $1,000 bill, and
 
•        $400 for expenses for a weekend sales trip to San Antonio.

The letter also stated, “Please plan to send $5,000 per week in June so you can get
the $20,000 balance paid off before the agreed upon date of July 1, 2005.”
          After the July 1, 2005 deadline for repayment had passed without Sims’s
repaying any money to Washburn, Washburn sent another letter on July 6, 2005. 
This letter had an attached promissory note for $27,000, and the letter stated,
“Please sign one copy of this Promissory Note and send it back to me with the first
payment of $294.10. I’ll have a deed of trust drafted up to secure this note.” Sims
did not negotiate any of these terms with Washburn and did not sign the note.
          On December 20, 2005, Washburn’s attorney sent a demand letter informing
Sims that he was required to pay Washburn $26,351.86 or Washburn would file a
lawsuit. On February 14, 2006, Sims received another letter from Washburn’s
attorney requesting that Washburn be removed as a director of APR.
          Washburn filed his lawsuit against Sims and APR on February 23, 2006,
alleging causes of action for balance due on an open account and unjust
enrichment. Sims answered on April 10, 2006 with a general denial and raised the
affirmative defenses of estoppel, waiver, and breach of agreement.
          On October 5, 2006, Sims filed a counter-petition against Washburn alleging
breach of contract and seeking damages. Sims’s counter-petition also alleged fraud
and specific performance.
          The trial occurred on February 22, 2007. Washburn, Sims, and Brock
testified to the story laid out above and presented their supporting documents. 
Washburn characterized the money that he had paid to Sims as loans that were
never repaid. He testified that his involvement with the business was merely his
attempt to do his “due diligence” and that he was just “getting a feel for” the
business and helping out a friend at the same time.
          Regarding the letter of intent, Washburn testified that he believed that he and
Sims needed to sign a letter of intent outlining their goals for the transaction before
they entered into a purchase agreement. Washburn contended that he and Sims had
discussed the need to sign a letter of intent. He testified that he had drafted the
letter of intent in January and had given it to Sims at that time, but that Sims had
not signed it at that time. Washburn believed that this was because Sims did not
feel comfortable signing the letter at that time. Washburn also testified that he had
spoken with Sims just before Sims signed the letter of intent on February 7, 2005
and that they had said that they “need[ed] to have a signed letter of intent first”
before they could “put together a purchase agreement.” Washburn contended that
he and Sims had never agreed on a purchase price for 51% of APR and that the
letter of intent required Sims to repay Washburn the money that he had invested in
APR because they had failed to reach such an agreement.
          Sims, on the other hand, testified that he and Washburn had reached a
complete agreement, including the price Washburn would pay for 51% of APR and
that they “shook on the deal” and hired a lawyer to draft the necessary documents
in November 2004. He and Brock both considered Washburn a partner in the
business from that time forward. Sims believed that the money given to him by
Washburn was intended to go toward Washburn’s purchase of 51% of APR and
was not a loan. Sims testified that he did not read the letter of intent carefully;
rather, he signed it believing that it was part of his agreement with Washburn to
purchase 51% of APR for $279,795 and was upset when the purchase agreement
that Washburn sent 10 minutes later named a different price than the purchase
agreement drafted by Cammack. Sims represented that he immediately contacted
Washburn to ask why he used the “bait and switch” tactic, and he testified that
Washburn then “backed down” from the lower purchase price and promised that
the parties would be able to work something out. Sims testified that he realized
that they had not agreed on a price for the sale of 51% of APR only after he had
signed the letter of intent and received Washburn’s version of the purchase
agreement listing $113,534 as the purchase price. Sims stated that he and
Washburn were not able to reach a final agreement, and Sims refused to repay any
money to Washburn.
          The jury found that Sims and Washburn had agreed that Sims would refund
the amounts paid by Washburn in the event that the sale of 51% of APR was not
completed by March 15, 2005


 and that Sims had failed to comply with this
agreement. However, the jury also found that Sims’s failure to comply was
excused because of Washburn’s failure to comply with the same agreement,
because Washburn had repudiated the agreement, or because Washburn had
waived his rights under the agreement. The jury found that neither Sims nor APR
was unjustly enriched at Washburn’s expense and that Washburn was not entitled
to any damages. Furthermore, the jury found that Washburn and Sims had agreed
that Washburn would purchase 51% of APR for $279,795, that Washburn had
failed to comply with this agreement, and that Sims was entitled to $36,000 in
damages. The jury also found that Sims had substantially relied to his detriment on
Washburn’s promise, but that Sims was not entitled to any damages for his
reliance.
          The trial court entered the final judgment on March 6, 2007. On April 4,
2007, Washburn filed both a motion for judgment notwithstanding the verdict and
a motion for new trial. In the motion for judgment notwithstanding the verdict,
Washburn complained that there was no evidence to support the jury’s finding that
Sims’s failure to perform was excused or that Washburn had agreed to purchase
51% of APR for $279,795. In the alternative, he argued that the jury’s finding that
he had agreed to the $279,795 purchase price was against the overwhelming
weight of the evidence. Washburn asked that the trial court disregard the jury’s
findings that he had agreed to the $279,795 purchase price, that he had failed to
comply with that agreement, and that Sims was entitled to $36,000 in damages. He
argued that because the agreement required no performance on his part, he could
not have failed to comply with any material obligation of such agreement. 
Likewise, he argued that there was no evidence to support a finding that he had
repudiated the agreement or that he had intentionally relinquished his right to
recover the amounts paid by him.
          In his motion for new trial, Washburn argued that “[t]here was no evidence
to support the jury’s affirmative finding” that Sims’s failure to perform his
obligation to repay Washburn was excused and, “alternatively, [that] there was
insufficient evidence to support such findings or the jury finding was against the
overwhelming weight of the evidence.” He raised identical complaints regarding
the jury’s findings that Washburn had agreed to the purchase of 51% of APR for
$279,795, that his breach entitled Sims to $36,000 in damages, and that Sims had
detrimentally relied on Washburn’s promises.
          The trial court denied Washburn’s motion for judgment notwithstanding the
verdict and motion for new trial on April 17, 2007. Washburn filed his notice of
appeal on May 21, 2007.
Legal and Factual Sufficiency
Washburn argues five issues on appeal. In his third issue, Washburn
complains that the evidence was legally and factually insufficient to support the
jury’s finding that Washburn had agreed to purchase 51% of APR for $279,795.00. 
In his first issue, Washburn complains that the evidence was legally and factually
insufficient to support the jury’s finding that Sims’s failure to repay Washburn’s
$20,000 when the sale of 51% of APR was not completed by March 15, 2005 was
excused. The unobjected-to jury charge allowed the jury to find that Sims’s
compliance was excused if it also found that Washburn’s had failed to comply with
their agreement, that Washburn had repudiated their agreement, or that Washburn
had waived his rights under the agreement. In his fourth issue, Washburns
complains that the evidence was legally and factually insufficient to support the
jury’s finding that Sims was entitled to $36,000 in damages. In his second issue,
Washburn complains that the evidence was legally and factually insufficient to
support the jury’s finding that neither Sims not APR was unjustly enriched. In his
fifth issue, Washburn complains that the trial court erred in not making the award
of attorney’s fees contingent on Sims’s winning on appeal.
A.      Standard of Review
          In a legal sufficiency, or “no-evidence,” review, we determine whether the
evidence would enable reasonable and fair-minded people to reach the verdict
under review. City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). In
conducting this review, we credit favorable evidence if reasonable jurors could and
disregard contrary evidence unless reasonable jurors could not. Id. We consider
the evidence in the light most favorable to the finding under review and indulge
every reasonable inference that would support it. Id. at 822. We must sustain a
no-evidence contention only if (1) the record reveals a complete absence of
evidence of a vital fact, (2) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact, (3) the evidence
offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence
establishes conclusively the opposite of the vital fact. Id. at 810; Merrell Dow
Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).
          In reviewing a challenge to the factual sufficiency of the evidence, we must
consider and weigh all of the evidence and should set aside the judgment only if it
is so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust. Arias v. Brookstone, L.P., 265 S.W.3d 459, 468 (Tex. App.—Houston
[1st Dist.] 2007, pet. denied) (citing Cain v. Bain, 709 S.W.2d 175, 176 (Tex.
1986)).
          The jury is the sole judge of witnesses’ credibility; it may choose to believe
one witness over another, and a reviewing court cannot impose its own opinion to
the contrary. Wilson, 168 S.W.3d at 819; Arias, 265 S.W.3d at 468. Because it is
the jury’s province to resolve conflicting evidence, we must assume that jurors
resolved all conflicts in accordance with their verdict if reasonable human beings
could do so. Wilson, 168 S.W.3d at 819; Arias, 265 S.W.3d at 468.
          With both legal and factual sufficiency complaints, the starting point for our
analysis when, as here, there is no complaint of charge error is the charge actually
submitted to the jury. Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757,
762 (Tex. 2003) (factual sufficiency); Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex.
2000) (legal sufficiency).
B.      Terms of the Agreement
          The jury found that the parties had agreed that Sims would sell Washburn
51% of APR for $279,795 and that Sims would refund the amounts paid by
Washburn in the event that the sale of 51% of APR was not completed by March
15, 2005.
          Washburn argues that his only obligation under the letter of intent was to
pay the $20,000 mentioned in the letter of intent and that the parties had no other
agreement. Sims, on the other hand, argues that their prior purchase agreement
was “inextricably part” of the letter of intent agreement and that the letter of intent
obligated Washburn to complete the purchase of 51% of APR. We must first
determine whether the evidence was legally and factually sufficient to support the
jury’s determinations that the parties agreed that Washburn would purchase 51% of
APR for $279,795.
          The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a
meeting of the minds, (4) each party’s consent to the terms, and (5) execution and
delivery of the contract with the intent that it be mutual and binding. Prime Prods.,
Inc. v. S.S.I. Plastics, Inc., 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.]
2002, pet. denied). In order to be legally binding, a contract must be sufficiently
definite in its terms so that a court can determine the respective legal obligations of
the parties. T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218, 221 (Tex.
1992). The material terms of the contract must be agreed upon before a court can
enforce the contract. Id. When an essential term of a contract is left open for
future negotiations, there is no binding contract, but only an agreement to agree. 
See Fort Worth Indep. Sch. Dist. v. City of Fort Worth, 22 S.W.3d 831, 846 (Tex.
2000); T.O. Stanley Boot Co., 847 S.W.2d at 221. “The rules regarding
indefiniteness of material terms of a contract are based on the concept that a party
cannot accept an offer so as to form a contract unless the terms of that contract are
reasonably certain.” Fort Worth Indep. Sch. Dist., 22 S.W.3d at 846.
          The letter of intent specifically stated, “A definitive purchase agreement will
be negotiated and executed between [the parties].” No price was named in the
letter of intent, and it specifically mentioned repayment of “earnest money” if “an
agreed upon price cannot be negotiated . . . .” The letter of intent clearly left the
price undefined.
          Sims argues that the price should be implied from the alleged oral agreement
between the parties and the purchase agreement drafted by Cammack but never
signed by both parties. However, “[p]arties to a contract are bound by its plain
terms and their intentions are to be ascertained from the language of the contract
itself and not from what they supposed it to contain.” Bifano v. Econo Builders,
Inc., 401 S.W.2d 670, 676 (Tex. Civ. App.—Dallas 1966, writ ref’d n.r.e.). 
Furthermore, it is well-established that when parties have integrated their
agreement into a single written memorial, all prior negotiations and agreements on
the same subject matter are excluded from consideration, whether they were oral or
written. Gary E. Patterson & Assocs. v. Holub, 264 S.W.3d 180, 197 (Tex.
App.—Houston [1st Dist.] 2008, pet. denied) (“[A] written instrument presumes
that all prior agreements relating to the transaction have been merged into it and
will be enforced as written and cannot be added to, varied, or contradicted by parol
testimony.”); see Weitzman v. Steinberg, 638 S.W.2d 171, 175 (Tex. App.—Dallas
1982, no writ) (“Courts cannot make contracts for the parties and an agreement to
enter into negotiations in the future cannot be enforced because the court has no
means to determine what sort of contract the negotiations would have produced.”);
Wooten Props., Inc. v. Smith, 368 S.W.2d 707, 709 (Tex. Civ. App.—El Paso
1963, writ ref’d) (stating that contract “shall be enforced as it is written, according
to the ordinary meaning and usage of the words or terms involved, regardless of
whether one or more of the parties contracted wisely or foolishly, or created a
hardship for himself”). The express terms of the written, signed letter of intent
conclusively negate Sims’s position that an agreement to purchase had already
been made. To the contrary, the letter of intent states that a definitive purchase
agreement would be negotiated and executed and, if such an agreement was not
executed by March 15, 2005, the $20,000 would be returned to Washburn by July
1, 2005. Therefore, we hold that the evidence was legally insufficient for the jury
to conclude that Washburn had agreed to purchase 51% of APR for $279,795. See
Wilson, 168 S.W.3d at 810. Thus, we need not determine if the evidence was
factually sufficient to support the finding.
          We sustain Washburn’s third issue.

C.      Excuse for Sims’s Failure to Perform
          The jury also found that Sims was excused from complying with the
agreement. The unobjected-to charge allowed the jury to excuse Sims based on
Washburn’s earlier failure to comply with the same agreement, repudiation, or
waiver. Washburn complains, in his first issue, that the evidence supporting the
jury’s finding on this issue was legally and factually sufficient. We have already
held that the evidence does not support a breach-of-contract finding against
Washburn because no agreement existed for him to purchase 51% of APR. 
Washburn could not fail to comply with an agreement that did not exist. 
Accordingly, we hold that no evidence supports the jury’s finding that a breach by
Washburn excused Sims’s failure to repay Washburn $20,000.
          Nor can Sims be excused based on a finding that Washburn repudiated the
agreement. A party’s performance is excused if the other party repudiates a
dependent performance. See El Paso Prod. Co. v. Valence Operating Co., 112
S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (“Upon a
party’s repudiation of a contract, the nonrepudiating party may treat the
repudiation as a breach . . . .”). Repudiation consists of words or actions by a
contracting party that indicate that he is not going to perform his contract in the
future. Leonard v. Lane, 821 S.W.2d 275, 278 (Tex. App.—Houston [1st Dist.]
1991, writ denied). It is conduct that shows a fixed intention to abandon, to
renounce, and to refuse to perform the contract. Id.
          The only evidence that Sims presented in support of Washburn’s alleged
repudiation of their agreement related to Washburn’s unwillingness to purchase
51% of APR for $279,795. Sims testified that he called Washburn immediately
after having received Washburn’s purchase agreement and that Washburn “backed
down” from the $113,534 purchase price and told Sims that they would work
something out—a statement clearly related to their disagreement over the purchase
price. Sims argues that this comment and Washburn’s ultimate refusal to complete
the purchase for $279,795 constituted a repudiation of their agreement. As we
have already held, the evidence does not support a finding that Washburn ever
agreed to purchase 51% of APR for $279,795; thus, his refusal to complete the sale
of 51% of APR at that price cannot constitute repudiation. Therefore, there is no
evidence that Washburn repudiated their agreement. Accordingly, we also hold
that no evidence supports the jury’s finding that Sims was excused from complying
with the agreement on this basis. See Wilson, 168 S.W.3d at 810; El Paso Prod.
Co., 112 S.W.3d at 621.
          Similarly, Sims cannot be excused on the basis of waiver. Waiver is defined
as “an intentional relinquishment of a known right or intentional conduct
inconsistent with claiming that right.” Jernigan v. Langley, 111 S.W.3d 153, 156
(Tex. 2003). Waiver is largely a matter of intent, and for implied waiver to be
found through a party’s actions, intent must be clearly demonstrated by the
surrounding facts and circumstances. Id. There can be no waiver of a right if the
person sought to be charged with waiver says or does nothing inconsistent with an
intent to rely upon such a right. Id.
          Sims argues that Washburn waived his right to enforce the agreement when
Washburn “backed down” from the $113,534 purchase price and told Sims that
they could work something out. Again, this is related to Sims’s and Washburn’s
disagreement over the purchase price and does not demonstrate Washburn’s intent
to waive his right to enforce the repayment provision in the letter of intent. 
Furthermore, Washburn attempted to collect the money that he had paid to Sims
and APR on several occassions before filing this suit.
          Sims also argues that the jury could have implied waiver to prevent fraud or
inequitable consequences based on the testimony that Washburn waited 10 minutes
after sending the letter of intent before he sent the purchase agreement. “Waiver
by implication will be applied only to prevent fraud or inequitable consequences
and, thus, an implied waiver must be evidenced by clear, unequivocal, and decisive
acts from which can be inferred the intention to relinquish the right.” Taub v.
Houston Pipeline Co., 75 S.W.3d 606, 624 (Tex. App.—Texarkana 2002, pet.
denied). The timing of Washburn’s faxes is not a “clear, unequivocal, and
decisive” act from which one can infer his intention to relinquish his right to
enforce the repayment provisions of the letter of intent. Therefore, we hold that
there is no evidence that Washburn said or did anything inconsistent with his intent
to rely on his right to enforce the repayment provision. We thus hold that no
evidence supports the jury’s finding that Sims was excused from performing on
this basis. See Wilson, 168 S.W.3d at 810; Jernigan, 111 S.W.3d at 156.
          Given our holdings, we need not reach Washburn’s factual sufficiency
challenge to these findings.
D.      Damages and Attorney’s Fees
          In his fourth issue, Washburn complains that the jury’s finding that Sims
was entitled to $36,000 in damages was not supported by legally and factually
sufficient evidence. The jury awarded Sims damages based on Washburn’s failure
to comply with his purported agreement with Sims to purchase 51% of APR for
$279,795. However, as we have already held, the evidence was insufficient to
support the jury’s finding that Sims and Washburn had ever reached such an
agreement. Therefore, we hold that the evidence is legally insufficient to support
the award of any damages for Washburn’s failure to comply. See Wilson, 168
S.W.3d at 810.
          We sustain Washburn’s fourth issue.
          In his second issue, Washburn argues that the evidence was legally and
factually insufficient to support the jury’s finding that neither Sims nor APR was
unjustly enriched at Washburn’s expense. We overrule this issue because it was
not preserved.


 In his fifth issue, Washburn argues that the trial court erred in not
making the award of attorney’s fees on appeal contingent to Sims’s winning the
appeal. We need not consider this issue because its resolution would not alter our
disposition of this appeal—our previous holdings have already granted Washburn
all of the relief that he requested. See Tex. R. App. P. 47.1.
 
 
 
Conclusion
          The trial court erred in denying Washburn’s motion for judgment
notwithstanding the verdict. We reverse the judgment of the trial court and render
judgment that Sims and APR take nothing from Washburn and that Washburn be
awarded $20,000 from Sims.








 
Tim Taft
                    Justice

Panel consists of Justices Taft, Bland, and Sharp.