Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



★   ★   ★                                              ★   ★   ★

# MEMORANDUM OPINION

No. 04-08-00171-CV

Derly **VILLARREAL**, Roel M. Villarreal, Francisco Villarreal, Anibal Villarreal,
Maria Villarreal, Gloria Villarreal Salinas, Viola V. Garcia, and Fernando Villarreal,
Appellants

v.

**CHESAPEAKE ZAPATA, L.P.** and Chesapeake Operating, Inc.,
Appellees

From the 49th Judicial District Court, Zapata County, Texas
Trial Court No. 5937
Honorable Joe Lopez, Judge Presiding

Opinion by:    Phylis J. Speedlin, Justice

Sitting:       Sandee Bryan Marion, Justice
               Phylis J. Speedlin, Justice
               Marialyn Barnard, Justice

Delivered and Filed:  July 8, 2009

REVERSED AND REMANDED

Derly Villarreal, Roel M. Villarreal, Francisco Villarreal, Anibal Villarreal, Maria Villarreal,

Gloria Villarreal Salinas, Viola V. Garcia, and Fernando Villarreal (collectively the "Villarreals")

appeal a summary judgment granted in favor of Chesapeake Zapata, L.P. and Chesapeake Operating,

Inc. ("Chesapeake). The underlying lawsuit was filed to resolve a dispute between the parties

regarding the ownership of a particular tract of real property. The Villarreals present five issues on appeal, asserting the trial court erred by: (1) concluding Chesapeake was entitled to summary judgment on an alleged pleading defect or that a genuine issue of material fact was not raised regarding record title to the property in question; (2) concluding Chesapeake established adverse possession of the property in question by non-parties to the litigation; (3) excluding portions of the deposition testimony of Derly Villarreal and Pedro Morales; (4) concluding Chesapeake established that a non-party designedly enclosed the property in question as a matter of law; and (5) concluding that the Villarreals failed to present more than a scintilla of evidence on each element of their trespass to real property, conversion, and Texas Natural Resources Code claims. This opinion will address the Villarreals' separate issues only to the extent necessary to resolve whether summary judgment was proper as to each of their causes of action.

### BACKGROUND

In 2004 and 2005, Chesapeake drilled two gas wells on a 67 acre tract of property in Zapata County, Texas known by the parties as the "Rectangle." Chesapeake leased the Rectangle from the Ramirez Mineral Trust. The Villarreals subsequently sued Chesapeake in 2005 asserting that they owned the Rectangle. At the time the trial court heard Chesapeake's motion for summary judgment, the Villarreals were asserting claims for: (1) declaratory judgment; (2) trespass to real property; (3) conversion; and (4) damages pursuant to section 85.321 of the Texas Natural Resources Code.

Chesapeake moved for a traditional summary judgment asserting: (1) the Villarreals failed to plead a trespass to try title claim which is critical to their establishing record title to the Rectangle; and (2) the Ramirez family, which owned the Ramirez Mineral Trust, established title to the Rectangle through adverse possession. Chesapeake also moved for a no-evidence summary

judgment challenging each element of the Villarreals' trespass to real property, conversion, and Texas Natural Resources Code claims. The trial court granted both summary judgments, and the Villarreals appeal.

## STANDARD OF REVIEW

We review both traditional and no evidence summary judgments de novo. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004). We consider the evidence in the light most favorable to the non-movant and indulge all reasonable inferences and resolve any doubts in the non-movant's favor. *Id.* at 157. We will affirm a traditional summary judgment only if the movant established that there are no genuine issues of material fact and it is entitled to judgment as a matter of law on a ground expressly set forth in the motion. *Id.* We will affirm a no-evidence summary judgment only if the non-movant failed to produce more than a scintilla of probative evidence raising a genuine issue of material fact on a challenged element of the cause of action. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

## RECORD TITLE AND PLEADINGS

In their first issue, the Villarreals contend the trial court erred in granting summary judgment on the basis that they failed to plead their claim as a trespass to try title cause of action. The Villarreals further contend that they raised a genuine issue of material fact with regard to record title.

Chesapeake responds that the trial court's order does not state that summary judgment was granted on the basis of a pleading defect. Chesapeake further responds that the trial court did consider, or could have considered, the Villarreals' pleadings in the nature of a trespass to try title cause of action.

A trespass to try title action is the exclusive means to resolve a real property title dispute. *Martin v. Amerman*, 133 S.W.3d 262, 265 (Tex. 2004). A declaratory judgment action can, however, be characterized by a court as a trespass to try title claim. *Loeffler v. Lytle Ind. Sch. Dist.*, 211 S.W.3d 331, 339 (Tex. App.—San Antonio 2006, no pet.).

It is well settled that the issue of whether pleadings fail to state a cause of action may not be resolved by summary judgment. *Castano v. San Felipe Agric., Mfg., & Irrigation Co.*, 147 S.W.3d 444, 452 (Tex. App.—San Antonio 2004, no pet.). Only after a party has been given the opportunity to amend may the case be dismissed for failure to state a cause of action. *Id*.

From the record, it appears that the Villarreals' failure to plead a trespass to try title claim was raised at the trial court level on various occasions but not by special exceptions. It is unclear why the Villarreals avoided pleading a claim for trespass to try title. In any event, it does not appear that the failure to plead a trespass to try title claim was the basis for the trial court's order. At a subsequent hearing in which the trial judge discussed with the parties the orders he intended to sign, the trial judge stated, "I understand that you have absolutely placed forth summary judgment evidence that places into dispute – at least a disputed fact with regard to record ownership, and as a result of that then with regard to that part of it you wouldn't have anything to worry about it." We note, however, that if the trial court had granted summary judgment on the basis of a pleading defect, the summary judgment would have been erroneous. *Id*.

The Villarreals presented a title opinion and the deposition testimony of their expert, Cornelius Hayes, in which Mr. Hayes details the documentation he reviewed to support his conclusion that the Villarreals owned record title to the Rectangle. Although Chesapeake also presented expert testimony in which their expert reached the conclusion that the Ramirezes owned

record title, the conflict in these expert opinions raises a genuine issue of material fact with regard to record title. *See Joe*, 145 S.W.3d at 157; *Tex. Emp. Ins. Ass'n v. Cervantes*, 584 S.W.2d 376, 380 (Tex. Civ. App.—San Antonio 1979, writ ref'd n.r.e.). As a result, if the summary judgment was granted on the basis of record title, it was erroneous.

## ADVERSE POSSESSION

To support a claim for adverse possession, a claimant must prove: (1) actual possession of the disputed property; (2) under a claim of right; and (3) that is adverse or hostile to the claim of another person and that it was consistently and continuously so for the duration of the statutory period. TEX. CIV. PRAC. & REM. CODE ANN. § 16.021 (Vernon 2002); *Martin v. McDonnold*, 247 S.W.3d 224, 235 (Tex. App.—El Paso 2006, no pet.); *Cherokee Water Co. v. Freeman*, 145 S.W.3d 809, 817 (Tex. App.—Texarkana 2004, pet. denied). The test for hostility is whether acts performed by the claimant on the land, and the use made of the land, were of such a nature and character as to reasonably notify the true owner of the land that a hostile claim was being asserted to the property. *Martin*, 247 S.W.3d at 235; *Cherokee Water Co.*, 145 S.W.3d at 817. Possession must not only be actual, but also visible, continuous, notorious, distinct, hostile (i.e., adverse), and of such a character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant. *Martin*, 247 S.W.3d at 235; *Cherokee Water Co.*, 145 S.W.3d at 817.

"Possession of land by adverse claimants who began their entry upon the disputed land with the permission of the record owner cannot establish adverse possession unless and until they give notice of the hostile nature of their possession. *Wright v. Wallace*, 700 S.W.2d 269, 271 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.); *see also Commander v. Winkler*, 67 S.W.3d 265, 269 (Tex. App.—Tyler 2001, pet. denied). "Where the original use of the land in controversy is

permissive, it is presumed that the continued use thereof is also permissive in the absence of notice to the true owner of the repudiation of such permissive use and the assertion of an adverse claim." *Commander*, 67 S.W.3d at 270.

The Villarreals primarily rely on the testimony of Derly Villarreal and Pedro Morales to assert that fact issues were raised with regard to the hostile element of the adverse possession claim. The Villarreals claim that Derly's father gave the Ramirezes permission to use the Rectangle; therefore, the Ramirezes' possession of the Rectangle was not hostile. Chesapeake responds that the trial court properly sustained its hearsay objection to the testimony relied upon by the Villarreals.

Setting aside the deposition testimony that the trial court excluded as hearsay, the record still contains sufficient summary judgment evidence to raise a genuine issue of material fact as to the hostile element of the Ramirezes' adverse possession claim. Considering only the portions of Derly Villarreal's deposition that were not excluded, Derly testified to the following:

> Q. What are you asking for in this case? What are you asking the court to do for you in this case?
>
> A. Well, we want to, to get back the land that my father gave permission to the Ramirez people to cross their – from one, from the east part of their land to the south and they have to cross our land there. And they had permission from my dad.
>
> ****
>
> Q. (By Mr. Zaffirini) Okay. Now, have you had possession of that particular tract that you marked in red on Deposition Exhibit 16 at any time?
>
> A. No, sir, because my father gave them permission to the Ramirezes family. They were – I used to call them uncles because we were related, very – very near.
>
> Q. Uh-huh.
>
> A. And they had some land here and the other land here, this belonged to them.
>
> Q. Okay.
>
> A. And they didn't have no way to come to this other place unless my father gave them permission to cross his tract of land.
>
> Q. I see. And when you – you were pointing that the – the Ramirez-owned land there and there, you were referring to the tract immediately east of the square – or the rectangle that you marked in red and immediately west –

A.      Yes.
                                    ****
Q.      And what you're telling us is that your father gave the Ramirezes permission to use that tract?
A.      Yes, sir, to cross from one place to the other.
Q.      Okay.  And as a consequence, you and your brothers have never had possession of that rectangle that's marked in red?
                MR. RAMIREZ: Object to the form.  Go ahead.
A.      No, because my father gave them permission to put a fence here so that his cattle wouldn't mix with their cattle, so they had to put a fence here.
                                    ****
Q.      Okay.  Was there, was there any written document?
A.      It was oral permission.  I was present.
                                    ****
Q.      (By Mr. Zaffirini) Has anyone from your family had possession of that rectangle since 1943?
A.      No, sir, because since my father gave them permission, there was a fence there.
Q.      Sure.
A.      And we respect the permission that my father gave them, the Ramirezes and Leopoldo.
                                    ****
Q.      Was there a, a gate on this north side of the rectangle so that you could enter it, enter that rectangle and come back out?
A.      No, sir, there's no gate there.
Q.      Okay.  And as far as you can remember, there never has been a gate there?
A.      No, because we respected the permission that my father gave them.
                                    ****
Q.      (By Mr. Zaffirini) And as far as you know, your cattle have not grazed on that rectangle since 1943.
A.      No, sir.
Q.      And neither have your brothers had any of their cattle graze on that rectangle?
A.      No, sir.  No, sir.  We all respected what my dad did.
Q.      Okay.
A.      The permission.
                                    ****
Q.      Inside the rectangle?
A,      Yes, sir.
Q.      Okay.  And that's where the Ramirezes gathered their cattle?
A.      Yes, sir.
Q.      And when did they start doing that?
A.      Since, since my father gave them permission to – they used to cross here and –
                                    ****

Q.    Okay. So you were aware that the Ramirezes have had possession of that rectangle for over 60 years?

MR. RAMIREZ: Object to the form.

Q.    (By Mr. Zaffirini) Is that correct?

A.    Well, possession – I don't know whether possession. I don't think so because it was a permission.

Q.    Well, they've been using that rectangle –

A.    Yes, with permission.

****

Q.    (By Mr. Zaffirini) Have – did your father ever acknowledge that he did not own that rectangle?

A.    No, that was his land. He always say that he just gave them permission to use it, to cross.

****

Q.    (By Mr. Zaffirini) Now, you have told us that your father had given the Ramirezes permission to use that rectangle that is marked in red on Exhibit 16. Can you tell us how long that permission was supposed to last?

A.    No, sir. No, sir.

Q.    You don't know how long?

A.    No, until any was – but we respected his permission, that was the problem.

Q.    Was the permission supposed to be forever and ever?

A.    No, sir.

Q.    Okay, It was supposed to be for a certain length of time?

A.    No, he didn't put no time on it.

Q.    Oh, he didn't put any time –

A.    He didn't talk about the time.

Q.    Okay. So, so then do you interpret that to mean that it was forever and ever?

A.    No, sir.

Q.    So there was some time limit; you don't know what it was?

A.    Right.

Q.    Okay. Did he tell you that you should respect that, that permission?

A.    Who, my dad?

Q.    Yes.

A.    Yes.

Q.    He told you that?

A.    Yes.

****

Q.    Okay. Did your father put any conditions to their permission that you claim he gave the Ramirezes to use the land?

A.    No, he just told them, gave them to cross, egress and outgress [sic].

****

Q.    Okay. Is there anything in writing that would show that you were intending to leave out that rectangle in the partition?

A.    No, sir.

Q. Okay. Was that discussed between you and your brothers?
A. Yes, because since they had the permission, we didn't want to bother the neighbors. We used to get along fine with them so we didn't want to bother with them. The land is ours and we respected the permission that my father gave them.

****

Q. So Anibal would have to go out to the Airport Road and then come back into the rectangle?
A. Well, we never did go in because they had permission to cross.

****

Q. Why would you leave out the rectangle from this application?
A. Because the Ramirezes had permission to use it and we didn't want to – we respected the permission that my father, Catarino, gave them and we didn't want to bother them because they were good neighbors. We didn't want to bother them for the meantime.

****

Q. (By Mr. Zaffirini) Do you know why your father would have given them permission to occupy all of the rectangle to cross the cattle?
A. Because my father have cattle here and of course they have to put this one here so they could get together with their cattle. That's the reason why he had this fence here.
Q. Yeah, but wouldn't it have made more sense for your father to tell them okay, you can have a cajon 20, 30 feet wide at some location in that rectangle –
A. Right.
Q. – and then he would keep the rest?
        MR. RAMIREZ: Object to the form.
A. I don't know.
Q. (By Mr. Zaffirini) You don't know why?
A. No, sir.
Q. Okay. Would that make more sense to you?
        MR. RAMIREZ: Object to the form.
A. No, because he was the one who gave the permission.

Viewing this testimony in the light most favorable to the Villarreals as required by the applicable standard of review, the foregoing testimony was sufficient to raise a genuine issue of material fact as to whether the Ramirezes' possession of the Rectangle was by permission.

Chesapeake relies on the Texas Supreme Court's holding in *Tex-Wis Co. v. Johnson*, 534 S.W.2d 895, 901 (Tex. 1976), to contend that even if the use was initially undertaken based on permission, constructive notice of repudiation can be established by long continued possession. In

*Tex-Wis Co.*, the Texas Supreme Court held, "the jury may infer that notice of repudiation was brought home to the titleholder where there has been (1) long-continued possession under claim of ownership and (2) nonassertion of claim by the titleholder." 534 S.W.2d at 901; *but see Vrazel v. Skrabanek*, 725 S.W.2d 709, 711 (Tex. 1987) (holding use by express or implied permission of license, no matter how long continued, cannot ripen into an easement by prescription which requires the same hostile use necessary to establish adverse possession). Although a jury may be permitted to infer that constructive notice of repudiation was brought home to the Villarreals if this case proceeds to trial, we may not draw such an inference given the applicable standard of review and the evidence presented in this case.[1] Accordingly, a genuine issue of material fact was raised regarding the hostile element of the adverse possession claim, and the trial court erred in granting summary judgment on that claim.

## NO-EVIDENCE SUMMARY JUDGMENT

The trial court granted Chesapeake's no-evidence motion for summary judgment as to each of the Villarreals' remaining claims. Chesapeake appeared to only address the ownership and damages elements of these claims at the hearing before the trial court; however, we will analyze the evidence relating to each of the elements that Chesapeake challenged in its motion.

1. Trespass to Real Property

Trespass to real property occurs when a person enters another's land without consent. *Rankin v. FPL Energy, LLC*, 266 S.W.3d 506, 509 n.4 (Tex. App.—Eastland 2008, pet. denied); *Wilen v. Falkenstein*, 191 S.W.3d 791, 797-98 (Tex. App.—Fort Worth 2006, pet. denied). To recover

---

[1] Although we recognize that long-continued use is a separate ground on which to base an adverse possession claim from change in the use or character of possession, *see Tex-Wis Co.*, 534 S.W.2d at 899, we note that the evidence does show that the Villarreals objected when the Ramirezes' use of the Rectangle changed.

damages, a plaintiff must prove that: (1) the plaintiff owns or has a lawful right to possess real property; (2) the defendant entered the plaintiff's land and the entry was physical, intentional, and voluntary; and (3) the defendant's trespass caused injury to the plaintiff. *Rankin*, 266 S.W.3d at 509 n.4; *Wilen*, 191 S.W.3d at 798.

We previously discussed the evidence raising a genuine issue of material fact with regard to the Villarreals' ownership of the Rectangle. It is undisputed that Chesapeake intentionally entered and drilled wells on the Rectangle. Finally, Chesapeake's senior account manager, April Smith, testified that Chesapeake had produced 6,363,340 MCF of oil, gas, condensate or other minerals from the wells located on the Rectangle valued at $40,046,955.34. Accordingly, the Villarreals produced more than a scintilla of evidence on each of the elements of their trespass to real property claim.

2.      Conversion

To establish a claim for conversion, a plaintiff must show: (1) title; (2) right to possession; and (3) a demand for the return of the property unless the possessor's acts manifest a clear repudiation of the plaintiff's rights. *Buffet Partners, L.P. v. Sheffield Square, L.L.C.*, 256 S.W.3d 920, 924 (Tex. App.—Dallas 2008, no pet.); *El Paso Production Co. v. Valence Operating Co.*, 112 S.W.3d 616, 625 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). We previously discussed the evidence produced with regard to the title and right to possession elements of the Villarreals' conversion claim. Both James E. Fansher and Gary Dunlap, who were representatives of Chesapeake, testified that despite Chesapeake's knowledge of the Villarreals' claim regarding ownership, Chesapeake decided to continue its drilling and production operations on the Rectangle.

Accordingly, the Villarreals produced more than a scintilla of evidence on each of the elements of their conversion claim.

3.      Violation of Natural Resources Code

Section 85.321 of the Texas Natural Resources Code provides:

> A party who owns an interest in property or production that may be damaged by another party violating the provisions of this chapter that were formerly a part of Chapter 26, Acts of the 42nd Legislature, 1st Called Session, 1931, as amended, or another law of this state prohibiting waste or a valid rule or order of the commission may sue for and recover damages and have any other relief to which he may be entitled at law or in equity. Provided, however, that in any action brought under this section or otherwise, alleging waste to have been caused by an act or omission of a lease owner or operator, it shall be a defense that the lease owner or operator was acting as a reasonably prudent operator would act under the same or similar facts and circumstances.

TEX. NAT. RES. CODE ANN. § 85.321 (Vernon 2001). In its motion, Chesapeake claimed the Villarreals had no evidence that they: (1) owned the Rectangle; (2) Chesapeake damaged the Rectangle or production therein; or (3) "the damage or injury was the result of a violation of the provisions of the Natural Resources Code."

The evidence previously discussed satisfied the Villarreals' burden of producing a scintilla of evidence with regard to ownership and damages. In their brief, the Villarreals provide no record citation to any evidence regarding the third element of the claim challenged by Chesapeake, i.e., that the damage or injury was a result of a violation of the provisions of the Natural Resources Code. In addition to allowing a lawsuit alleging damage based on a violation of the Natural Resources Code, however, section 85.321 also allows a party to sue for damages caused by a violation of "any other law of this state prohibiting waste or a valid rule or order of the commission." Because Chesapeake's no-evidence motion did not challenge these alternative grounds for establishing this claim, the trial court erred in granting the no-evidence summary judgment as to this claim. TEX. R.

CIV. P. 166a(i) cmt. (noting respondent need only point out evidence raising fact issues on *challenged* elements).

## CONCLUSION

Reviewing the evidence under our applicable standard of review, we conclude that the Villarreals presented sufficient evidence to raise a genuine issue of material fact with regard to record title and adverse possession of the Rectangle. We further conclude that the Villarreals produced more than a scintilla of evidence sufficient to defeat Chesapeake's no-evidence motion for summary judgment with regard to the Villarreals' trespass to real property, conversion, and Texas Natural Resources Code claims. Accordingly, the trial court's judgment is reversed, and the cause is remanded for further proceedings.

Phylis J. Speedlin, Justice