**EL PASO PRODUCTION COMPANY,**
Appellant,

v.

**VALENCE OPERATING COMPANY,**
Appellee.

No. 01–01–00195–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

June 12, 2003.

Rehearing Overruled July 25, 2003.

Jefferson Hunt Read, Oldenettel & Associates, Houston, for Appellant.

Michael D. Conner, Hirsch & Westheimer, P.C., Houston, for Appellee.

Panel consists of Justices NUCHIA, JENNINGS, and DUGGAN.*

## OPINION ON REHEARING

SAM NUCHIA, Justice.

We deny appellee's motion for rehearing. However, we withdraw our opinion issued March 20, 2003 and issue this opinion in its place.

El Paso Production Company, the successor in interest to Sonat Exploration Company (together, Sonat), owned a working interest in the Holmes A–1 Well (the well) in Freestone County, Texas. Sonat sued appellee, Valence Operating Company (Valence), for breach of a joint operating agreement (the JOA) under which Valence was the operator and Sonat was one of the non-operators. After a jury trial, the trial court entered a take-nothing judgment against Sonat, and Sonat appealed. We reverse and remand.

## BACKGROUND

Texas Oil & Gas Corporation and the owners of oil and gas leases and interests entered into a JOA for the exploration and production of oil and gas from a 680–acre

---

* The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

contract area in Freestone County. The well was drilled on that contract area under the JOA. The JOA provided that, if any party to the agreement desired to rework, deepen, or plug the well that was drilled at the parties' joint expense,

> [That party] shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation.

The JOA further provided that the parties electing to participate in the proposed operation (consenting parties) would receive, in proportion to their respective interest, the share of production of any party not electing to participate (non-consenting parties) until the non-consenting parties' share was equal to "400% of that portion of the costs and expenses of drilling, reworking, deepening, or plugging back ... which would have been chargeable to such non-consenting party if it had participated therein."

> Regarding the sale of the oil and gas produced, the JOA granted each party the right to take its proportionate share in kind. In addition, the JOA provided,

> Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-taking party at the best price obtainable....

The JOA also provided, under "Maintenance of Uniform Interest,"

> For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:
>
> 1. the entire interest of the party in all leases and equipment and production; or
>
> 2. an equal undivided interest in all leases and equipment and production in the Contract Area.

> Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the right of the other parties.

The JOA included a Gas Balancing Agreement, which provided for any period when a party had no market for its share of gas, its purchaser was unable to take the gas, or the party failed to take the gas. In that event, the other parties were entitled to produce each month 100% of the allowable gas production, and each of those parties was to receive its pro rata share. The party who was unable to take or market its share "shall be credited with gas in storage equal to its share of the gas produced," and the operator was to "maintain a current account of the gas balance between the parties...." When the party began to take its share of the gas, the party could take, in addition to its share, 25% of each "over-produced party's share of gas produced." If production permanently ceased before the accounts were balanced, the accounts were to be balanced through a monetary settlement.

Valence succeeded to the rights of Texas Oil & Gas Corporation, which was the operator under the JOA. Sonat acquired a

17.58407% non-operating working interest in the well. Houston Lighting & Power Company (HL & P) was, and is, the owner of the surface of the land.

In 1993, HL & P, needing to enlarge its ash disposal area, began negotiations with Valence to acquire access rights to a tract of land within the unit. The negotiations were unsuccessful, and HL & P informed Valence that HL & P would pursue efforts to purchase rights of the individual mineral interest owners and would also proceed with a condemnation action.

HL & P offered Sonat $204,000 for the release of Sonat's surface rights to a 91–acre tract at the well site. Sonat accepted the offer and, on November 14, 1994, executed the following release:

> That the undersigned, who owns or claims a working interest or leasehold estate in the mineral estate presently being produced in the Marcus Holmes "A" Gas Unit ... hereby: 1) releases Houston Lighting & Power Company ("HL & P") from any and all claims for compensation ... directly or indirectly resulting from the acquisition by HL & P of the right to utilize the surface of that certain 91.217 acre tract of land ... and 2) quitclaims to HL & P all of my right, title and interest, if any, to directly or indirectly utilize or authorize the utilization of any portion of the surface of the Tract for the exploration, development or production of the underlying mineral estate.

> The undersigned further, to the extent possible under the terms of that certain Operating Agreement dated October 11, 1979 between Texas Oil & Gas Corporation, as Operator, and Seneca Resources, assign to HL & P the right to cause or otherwise authorize the Holmes A# 1 Gas Well, which is presently being operated on the surface of the tract, to be plugged and abandoned,

provided that such well shall not be plugged and abandoned prior to December 31, 1995.

> This document transfers no interest whatsoever in the oil, gas or other minerals underlying the Tract, or the right to lease same or participate in any of the production of these minerals, whether by royalty or otherwise, all of same being expressly excepted from this release.

> There is further excepted from this document the right and privilege of developing and producing the minerals underlying the Tract by pooling, unitization, directional drilling or similar means so long as HL & P's use of the surface of the Tract is not disturbed thereby.

> This document is subject to oil and gas leases currently in effect.

In a letter to Sonat dated August 12, 1996, Kenneth Cummings, a landman with Valence, referenced the release and informed Sonat,

> Valence now considers you as no longer having an interest in production from the well.

> Within the next two weeks, Valence plans to workover the Holmes A–1. Due to the terms of the "Release," we can no longer consider you a working interest owner.

> Note that this letter is intended merely as a courtesy notification of our upcoming operation. Please advise if you have any questions.

On April 4, 1997, Mark Robinson made the following reply on behalf of Sonat:

> Your position in this regard was so absurd that I thought you must be joking. Sonat's accounting personnel now tell me that it was no joke.

> Accordingly, please be advised that unless Valence agrees to credit Sonat with its working interest in the Holmes A 1 within ten (10) days from the date of

this letter, Sonat is going to file suit to have its interest judicially recognized, all without further notice to you. Of course, Sonat is willing to pay for its share of the costs and expenses associated with whatever work Valence has done on the Holmes A 1 since Sonat last received an AFE from Valence if you will send me a detailed listing of such costs and expenses.

Sonat sued Valence, asserting causes of action for conversion, breach of contract, breach of fiduciary duty, money had and received, unjust enrichment, fraud, misapplication of fiduciary property, and theft and, in addition, requested an accounting. Valence asserted a counterclaim for breach of contract, tortious interference, breach of fiduciary duty, unjust enrichment, money had and received, and conspiracy to defraud and also requested an accounting and declaratory relief.

The trial court granted a directed verdict in favor of Sonat on all of Valence's claims against Sonat, based on the expiration of the statute of limitations, except for Valence's request for declaratory relief. The trial court also granted a directed verdict in favor of Valence on all of Sonat's claims against Valence except for Sonat's breach-of-contract claim. The case was tried to a jury, which found that (1) Valence breached the agreement, (2) Sonat repudiated the agreement and waived the right to enforce the agreement, (3) Valence was excused from further performance under the agreement, and (4) Sonat failed to consent to workover operations at the well. The jury found that a negative $66,192 would compensate Sonat for damages resulting from Valence's breach and found $25,000 in reasonable and necessary attorney's fees for each party.

In its appeal, Sonat challenges the jury's findings on repudiation, waiver, failure to consent, and damages. Sonat also complains of the directed verdict on Sonat's claims for conversion and breach of fiduciary duty, the trial court's declaration that Sonat had a legal duty to market its own gas, the court's award of attorney's fees to Valence, and the court's failure to award Sonat prejudgment interest and to order an accounting.

## DISCUSSION

### 1. Repudiation

■ In its first two issues, Sonat contends that the evidence is legally and factually insufficient to support the jury's answer to jury question number three, which asked,

Do you find, by a preponderance of the evidence that Sonat repudiated the Operating Agreement such that Valence did not need to seek Sonat's consent to the 1966 workover operations at the Holmes A–1 well?

"Repudiation" is a positive and unconditional refusal to perform the contract in the future, expressed either before performance is due or after partial performance.

Answer "Yes" or "No"

The jury answered "Yes."

■ To constitute a repudiation, a party to a contract must have absolutely and unconditionally refused to perform the contract without just excuse. *Van Polen v. Wisch,* 23 S.W.3d 510, 516 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). Upon a party's repudiation of a contract, the nonrepudiating party may treat the repudiation as a breach or may continue to perform under the contract and await the time of the agreed-upon performance. *Ingersoll–Rand Co. v. Valero Energy Corp.,* 997 S.W.2d 203, 211 (Tex.1999). The nonrepudiating party must either rescind the contract or continue to perform under it; it cannot do both. *Bumb v. InterComp*

*Technologies, L.L.C.,* 64 S.W.3d 123, 125 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

Valence asserted repudiation as an affirmative defense. Therefore, Valence had the burden of proving that Sonat unconditionally refused to perform the contract. *See Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517 (Tex.1988).

Valence argues that Sonat repudiated the JOA by executing the release because Sonat "gave up all right it had to authorize Valence to rework" the well and "sold its right to produce the 'underlying minerals.'" Valence further argues that "it was impossible for Sonat to legally discharge its obligation under the JOA to contribute its proportionate share of costs for any development or production out of Holmes A 1." Valence does not direct us to any specific language in the JOA or the release to support its contention, nor does Valence cite any authority to support its "legal impossibility" argument. Valence also asserts that it did not rescind the contract, as it was entitled to do in response to Sonat's repudiation, but rather, "continued to perform under the JOA."

The release executed by Sonat released HL & P from claims for compensation resulting from HL & P's acquisition of rights to use the surface of the land and quitclaimed to HL & P Sonat's rights to use the surface for exploration, development, or production of the mineral estate. However, the assignment of the right to plug and abandon the well was made only to the extent possible under the terms of the JOA. The release explicitly did not transfer any interest in the oil, gas, or other minerals underlying the tract or the right to participate in any production. The release also reserved to Sonat the right of developing and producing the minerals by any means that did not interfere with HL & P's use of the surface, and the release was made subject to the current oil and gas leases on the tract.

The release did not convey Sonat's interest in the mineral estate, nor did it transfer any rights in the gas produced at the well. Furthermore, the release did not in any way interfere with Valence's activities as operator. In fact, by Valence's own admission, Valence has continued to produce gas from the well up to the time of trial. We hold that the release was no evidence that Sonat positively and unconditionally refused to perform its obligations under the JOA. We further hold that the execution of the release was not a repudiation of the JOA by Sonat.

We sustain Sonat's first issue (legal sufficiency) and, thus, need not reach its second issue (factual sufficiency).

## 2. *Waiver*

In its third and fourth issues, Sonat challenges the legal and factual sufficiency of the evidence to support the jury's answer to question number four, which asked,

> Do you find that Sonat, by conveying the interest of HL & P evidenced by the Release marked as Plaintiff's Exhibit 37, waived its right to demand compliance by Valence with the Joint Operating Agreement marked as Plaintiff's Exhibit 1?

"Waiver" is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. Waiver also occurs when a person, who has full knowledge of material facts, acts or fails to act upon rights which he or she legally holds, and such act or failure to act is inconsistent with that right or intention to rely upon that right.

Answer "Yes" or "No"

The jury answered "Yes."

■ Valence asserted waiver as an affirmative defense. Therefore, Valence had the burden of establishing all the elements of waiver. *See Woods*, 769 S.W.2d at 517. Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with the intent to claim that right. *Robinson v. Robinson*, 961 S.W.2d 292, 300 (Tex.App.-Houston [1st Dist.] 1997, no writ).

■ Valence asserts that Sonat's execution of the release was a sale of Sonat's right to explore, develop, and produce gas from the well, and that Sonat therefore waived its right to demand compliance with the JOA to the extent of any matter pertaining to exploration, development, or production of the "released" tract. We do not agree.

The release did not give up any right to participate in the oil and gas production of the well. The release stated that it was subject to the oil and gas leases currently in effect. The release quitclaimed to HL & P Sonat's rights to the surface for exploration, development, or production of the underlying mineral estate. However, it explicitly did not transfer any interest in that mineral estate. Cummings testified that only the operator needed access to the well. We conclude that the release is no evidence that Sonat intentionally relinquished its right to demand that Valence comply with the JOA.

We sustain Sonat's third issue (legal sufficiency) and, thus, need not reach its fourth issue (factual sufficiency).

### 3. Non–Consent

■ In its fifth issue, Sonat contends that the trial court erred in submitting question number six to the jury because Valence did not comply with the notice provision of the JOA for the rework of the well and, therefore, that Sonat could not be a non-consenting party. We construe this issue as a challenge to the legal sufficiency of the evidence to support the jury's answer to question number 6, which asked, "Did Sonat fail to consent to the 1996 workover operations at the Holmes A–1 well?" The jury answered "Yes."

By the terms of the JOA, a party who wanted to rework the well at the joint expense of all parties was required to give written notice of the proposed operation to the other parties. This notice was required to specify the work to be performed, the location, the proposed depth, the objective formation, and the estimated cost. A party who received such notice had 30 days in which to give notice of its election to participate. A party who did not give notice of participation became a non-consenting party and was subject to a 400% penalty if the reworked well produced in paying quantities. There was no provision in the JOA for the imposition of the penalty if the initial required notice was not given.

At trial, when Steve Manning, a vice-president of Valence, was asked whether Valence had provided the required notice to Sonat, he replied, "Of course not." On appeal, Valence contends that, because of Sonat's actions, Sonat was "contractually precluded from giving effective consent to walk up to Holmes A–1 for the purpose of any rework operation."

Even if Valence's contention is correct, Sonat's failure to consent to the rework operation cannot result in the imposition of any of the contractual penalties because the obligation to give timely notice of consent is triggered *only* by the required notice of proposed operations. Because the evidence conclusively established that Valence did not give such notice, it was

error for the trial court to submit jury question number six.

We sustain Sonat's fifth issue.[1]

### 4. Damages

■ In its seventh and eighth issues, Sonat challenges the legal and factual sufficiency of the evidence to support the jury's answer to question number two, which was predicated on the jury's finding in question number one that Valence had breached the JOA. Question number two asked,

> What sum of money, if any, if now paid in cash, would fairly and reasonably compensate Sonat Exploration Company for its damages, if any, that resulted from such a breach?
>
> Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.
>
> Answer in dollars and cents for damages, if any.

The jury's response shows the following calculations handwritten below the answer line:

| | | |
|---|---|---|
| Gross Income | 330,042 | |
| Expenses | < 129,234 > | includes rework $89,000 |
| Net Income | 200,808 | |
| Rework Penalty | < 267,000 > | |
| Answer | < $66,192 > | |

The answer is written as < $66,192 >.[2]

James Shows, a certified public accountant who testified for Sonat, testified that he calculated that, from August 1996 to the present time, Valence owed Sonat $200,808.13. Shows further testified that he and Walter Sherr, chief executive officer of Valence, came to an agreement that Shows's number was correct. Valence did not dispute Shows's calculations at trial and does not dispute it on appeal. We hold that there is no evidence to support the jury's answer to question number two.

In its motion for rehearing, Valence contends that the Gas Balancing Agreement provides the remedy for Valence's breach of contract. Valence argues that, consistent with the Gas Balancing Agreement, a "money settlement" can be made only after cessation of production, which Valence characterizes as a "condition precedent" to a money settlement.

1. In its sixth issue, Sonat challenges the factual sufficiency of the evidence to support the jury's answer to question number six. However, Sonat briefed only its legal sufficiency issue. In light of our ruling sustaining the legal sufficiency issue, Sonat's failure to brief the factual sufficiency is irrelevant.

2. It appears from the calculations written under question number two that the jury did not follow the trial court's instruction not to increase or reduce the amount because of an answer to another question. The jury calculated a net income amount that is consistent with the testimony of James Shows, Sonat's accounting expert. It appears that the jury then reduced that amount by applying the 400% penalty, which would have been the result of the jury's answer to question number six. However, we do not consider the jury's handwritten calculations in determining the sufficiency of the evidence to support the jury's answer because, unless there is evidence of misconduct, the jury's reasons for reaching a verdict are irrelevant. *See Thomas v. Oldham*, 895 S.W.2d 352, 360 (Tex.1995).

The Gas Balancing Agreement does not purport to provide the remedy for breach of contract. It provides a method of balancing the gas account in the event that any party to the JOA *fails* to take its share of gas. Sonat did not *fail* to take its gas. Sonat was prevented from taking the gas by Valence. Furthermore, Sonat was not suing for a "money settlement," but for monetary damages for breach of contract and other causes of action.

We sustain Sonat's seventh issue (legal sufficiency) and need not reach its eighth issue (factual sufficiency).

### 5. Directed Verdict: Conversion

In its tenth issue, Sonat contends that the trial court erred in granting Valence a directed verdict on Sonat's claim for conversion. Sonat argues that it pleaded, presented evidence of, and requested a jury question on its cause of action for conversion. The trial court granted Valence's motion for directed verdict on the conversion cause of action without explanation and denied Sonat's requested jury submission on the issue.

■ To establish a claim for conversion, a plaintiff must show (1) title, (2) right to possession, and (3) a demand for return of the property unless the possessor's acts manifest a clear repudiation of the plaintiff's rights. *Schwartz v. Pinnacle Communications*, 944 S.W.2d 427, 432 (Tex. App.-Houston [14th Dist.] 1997, no writ). Sonat argues that it established each of these elements.

■ Valence appears to contest the first element—title. Although Valence admits that Sonat had title to a percentage of the gas in the ground, it argues that Sonat no longer had an interest in production out of the well. Valence also asserts that, because of the JOA's penalty provision for Sonat's non-consent status, "neither gas nor proceeds from the sale of gas have been shown to exist." Thus, Valence argues that Sonat owned the gas, but had no interest in the produced gas, and that Sonat's interest belonged to the consenting parties until the penalty was paid in full. Valence also alludes, without elaboration, to the Gas Balancing Agreement and the trial court's determination that the JOA imposed no duty on Valence to market Sonat's gas.

We have determined, under Sonat's first issue, that Sonat did not repudiate the JOA. Therefore, Sonat had an interest in the produced gas in the same proportion as its interest in the gas in the ground. We have also determined, in Sonat's fifth issue, that Sonat was not a non-consenting party. Therefore, the penalty could not be imposed.

Sonat showed title and right to possession of the produced gas. Sonat also showed its demand for the proceeds of the produced gas in plaintiff's exhibit 39, Sonat's letter demanding that Valence credit Sonat with its working interest in the well. The trial court erroneously granted Valence's motion for directed verdict on Sonat's conversion cause of action.

We sustain Sonat's tenth issue.

### 6. Directed Verdict: Fiduciary Duty

■ In its eleventh issue, Sonat contends that the trial court erred in granting a directed verdict for Valence on Sonat's claims for breach of a fiduciary duty.

■ Although a joint operating agreement does not necessarily create a fiduciary relationship, such a relationship may exist if a special relationship exists between the parties in the form of a partnership, joint venture, or agency relationship. *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147, 169 (Tex.App.-Eastland 2001, no pet.). The existence of a fiduciary duty

is a question of law for the court. *Taylor v. GWR Operating Co.*, 820 S.W.2d 908, 911 (Tex.App.-Houston [1st Dist.] 1991, writ denied). However, the determination of factual issues underlying a fiduciary duty is a question of fact for the fact finder. *Id.*

In this case, both parties pleaded a cause of action for breach of fiduciary relationship. Sonat produced some evidence, through the testimony of Manning, that Valence marketed gas on behalf of Sonat from November 1994 through August 1996. Thus, whether Valence was acting as an agent for Sonat was a question of fact for the jury to determine. The trial court erroneously granted Valence's motion for directed verdict on Sonat's cause of action for breach of fiduciary duty.

We sustain Sonat's eleventh issue.

### 7. Legal Duty to Market the Gas

■ In its fourteenth issue, Sonat contends that the trial court erred by rendering judgment that Valence had "no legal duty to market Sonat's gas." Sonat misstates the trial court's judgment. The judgment provides, "IT IS FURTHER ORDERED, ADJUDGED, JUDICIALLY DECLARED and DECREED that Sonat Exploration Company was legally obligated to market its own gas...." Sonat has not challenged this declaration. The reason, as stated in the judgment, for this declaration was the conclusion that the JOA imposed no legal duty upon Valence to market Sonat's gas. However, to the extent that Sonat challenges the basis for the court's declaration, we conclude that Valence did not have a duty under the JOA to market Sonat's gas.

There were two separate provisions in the JOA for the disposal of the produced gas. The JOA provided that a party could take its production in kind or could separately dispose of its share, but that if it did not, "Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-taking party." Exhibit C to the JOA, the Gas Balancing Agreement, provided for a party's ownership of its share of the gas in the ground in the event that the party could not or "fail[ed] to" take its share of gas. If production were to permanently cease before the party had taken its share of gas, the Gas Balancing Agreement provided for a money settlement. Thus, the JOA did not create a legal obligation on either the operator or the non-operators to market the gas.

We overrule Sonat's fourteenth issue.

### 8. Accounting

■ In its fifteenth issue, Sonat contends that the trial court erred in denying Sonat an accounting. However, Sonat does not specify the period of time the accounting should cover. There is evidence that Sonat and Valence agreed that the gross proceeds that would have been paid by Valence for Sonat's share of the produced gas from November 1994 through August 1996 was $330,042; that Sonat's share of the expenses, including expenses for reworking the well, were $129,234; and that the net proceeds that Valence would have paid Sonat was $200,808.[3] Therefore, it appears that a further accounting through August 1996

---

**3.** Valence argues that there was no basis for any accounting because Sonat's gas remained in the ground by the terms of the Gas Balancing Agreement. However, under the Gas Balancing Agreement, Valence was required to

"maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total

was unnecessary. We do not find, in the record, any request for an accounting of the proceeds of production after August 1996. In its motion for new trial, Sonat simply stated, "The trial court erred by not including in the Final Judgment Plaintiff's right to an accounting from Valence Operating Company." This complaint was not sufficiently specific to make the trial court aware of the relief requested. *See* Tex.R.App. P. 33.1. Thus, the issue is waived.

We overrule Sonat's fifteenth issue.

### 9. *Valence's Issues*

Valence asserts two cross-points challenging the legal and factual sufficiency of the evidence to support the jury's finding, in jury question number one, that Valence breached the JOA. In our original opinion, we stated that these issues were waived.

In its motion for rehearing, Valence asserts that, by its take-nothing judgment, the trial court rendered an *implied* judgment notwithstanding the verdict on the jury's finding that Valence breached the JOA. The record does not support Valence's argument. We find no motion by Valence for judgment notwithstanding the verdict and no motion to disregard the jury's finding in question number one. Therefore, a judgment notwithstanding the verdict would not have been proper. *See* Tex.R. Civ. P. 301. In its recitations, the judgment stated, "The jury answered ... that the breach of contract damages were a negative amount." In the decretal portion, the judgment decreed "that Sonat Exploration Company shall take nothing on any of its claims herein." This decree was consistent with the jury's findings on breach of contract and damages and, thus, constituted a judgment on the verdict.

Valence filed a motion for entry of judgment, and the trial court signed the judgment as it was submitted by Valence. Valence did not express to the trial court any dissatisfaction with the judgment. To preserve a complaint for review in a cross-point, an appellee must inform the trial court of its dissatisfaction with the judgment. *Kenneth Leventhal & Co. v. Reeves,* 978 S.W.2d 253, 258–59 n. 6 (Tex. App.-Houston [14th Dist.] 1998, no pet.); *Larrumbide v. Doctors Health Facilities,* 734 S.W.2d 685, 693 (Tex.App.-Dallas 1987, writ denied). Valence has waived its complaint. Accordingly, we overrule Valence's cross-points.

### CONCLUSION

We have sustained Sonat's issues one, three, five, and seven challenging the jury findings regarding repudiation, waiver, failure to consent, and damages. We have also sustained Sonat's issues 10 and 11 complaining about the trial court's directed verdict on Sonat's conversion and fiduciary-duty claims. We have overruled Sonat's fourteenth and fifteenth issues complaining about the trial court's determination of Sonat's legal duty to market its gas and the trial court's failure to order an accounting. Because the issues above dispose of this appeal, we need not reach Sonat's second, fourth, sixth, eighth, ninth, twelfth, or thirteenth issues.

We reverse the judgment of the trial court and remand the cause to the court below for proceedings consistent with this opinion.

---

quantity of condensate recovered." Furthermore, under that agreement, Sonat was entitled to take its share and up to 25% of each overproduced party's share until it had recovered its gas and balanced its account. Therefore, the Gas Balancing Agreement did not deprive Sonat of its right to an accounting.