# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 14, 2025

Lyle W. Cayce
Clerk

No. 24-20329

Penthol, L.L.C.,

*Plaintiff—Appellee*,

*versus*

Vertex Energy Operating, L.L.C.,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-416

Before Elrod, *Chief Judge*, and King and Graves, *Circuit Judges*.
James E. Graves, Jr., *Circuit Judge*:

This appeal concerns ramifications resulting from a terminated sales agreement between Vertex Energy Operating, L.L.C. ("Vertex"), a base oil manufacturer, and Penthol, L.L.C. ("Penthol"), a trading company. Vertex contends that Penthol repudiated its contractual obligations and is therefore responsible for the agreement's termination. Vertex also avers that it is entitled to attorneys' fees and other legal costs based on (1) a fee-shifting provision in the sales agreement and (2) Rule 54(d) of the Federal Rules of Civil Procedure. We conclude that Penthol's actions did not constitute an anticipatory repudiation and accordingly AFFIRM the district court's

conclusion that the sales agreement was prematurely, but mutually, terminated. We also conclude that the district court erred in finding that the sales agreement's fee-shifting provision barred Vertex from receiving fees associated with Penthol defaulting on its contractual obligations. We accordingly VACATE the denial of fees on that ground, and REMAND for additional proceedings. Lastly, we AFFIRM the district court's denial of Vertex's request for prevailing-party fees.

## I.

In June 2016, Vertex and Penthol entered into the sales agreement that forms the locus of this dispute. Under the agreement, Vertex served as the exclusive North America sales representative of "ADbase," a Group III base oil[1] product that Penthol was tasked with distributing.[2] In exchange, Penthol provided Vertex with sales commissions and profit incentives. The sales agreement was scheduled to conclude on December 31, 2021.

Notably, Vertex also produced and sold a Group II base oil product, "VTX-6." But, as the district court observed, ADbase and VTX-6 were not commercial threats to each other because "Group III base oil is a much higher quality oil than Group II and sells for a higher price." *Penthol, LLC v. Vertex Energy Operating, LLC*, 722 F. Supp. 3d 660, 666 (S.D. Tex. 2024), *amended*, No. 4:21-CV-416, 2024 WL 3166936 (S.D. Tex. June 25, 2024) (the "Findings of Fact & Conclusions of Law"). The sales agreement also barred

---

[1] Base oils are produced by refining crude oil; the refining process removes impurities and various distillates. Petroleum-based base oils are classified as Group I, II, or III, with Group I being the least refined and Group III being the most refined.

[2] ADbase is manufactured by the Abu Dhabi National Oil Company ("ADNOC"). ADNOC retained Penthol to serve as its North America marketing agent.

No. 24-20329

Vertex from selling or promoting a product that competed with Penthol's ADbase product.

After four years without significant incident, Penthol and Vertex's sales relationship began to sour in October 2020. Penthol suspected that Vertex had received substantial capital investments that allowed it to investigate upgrading its facilities and produce a Group III base oil. Vertex believed that Penthol was independently contacting Vertex's customers in an attempt to undermine their sales relationship. In November 2020, Vertex secured a temporary injunction in Texas state court that enjoined Penthol from independently communicating with Vertex's customers.

Shortly after the injunction issued, an employee at Pinnacle, a customer that purchased both ADbase and VTX-6, provided Penthol's CEO with Certificates of Analysis that accompanied Vertex's VTX-6 deliveries.[3] At least one certificate showed that Vertex produced and delivered a batch of VTX-6 with a viscosity index that matched the qualities of a Group III base oil. The high figure caught Penthol's attention and led to an exchange of five letters that culminated with the agreement's early termination.

Letter 1: On December 18, 2020, Penthol wrote to Vertex to provide "Notice of certain Early Termination Events under section 7.1(b) of the" sales agreement. Penthol alleged that Vertex produced and sold at least one batch of VTX-6 that met the commercial specifications of a Group III base oil. Penthol demanded that Vertex "cure the defaults described [in its letter] within thirty (30) business days," and that if Vertex failed to do so, Penthol

---

[3] In its Findings of Fact and Conclusions of Law, the district court defined a certificate of analysis as: "an analysis of a load of base oil that breaks down and grades/describes its primary components. These [certificates] usually accompany the product when it is delivered to the customer." Findings of Fact & Conclusions of Law, 722 F.Supp.3d at 668–69.

would "terminate the Agreement pursuant to section 7.1(b)" of the sales agreement.

Letter 2: Vertex responded on January 19, 2021. It explained that VTX-6 was neither marketed nor sold as a Group III base oil, and that the properties of the identified batch did "not meet the specifications of Group III base oils." Vertex also noted that VTX-6 had been on the market since December 2014, and that some customers purchased both products. Vertex contended that this demonstrated the products' differentiation, and that Vertex did not impermissibly compete with Penthol. Vertex concluded by stressing that "Penthol has no legitimate basis to terminate" the sales agreement and warned that "[i]f Penthol does terminate the Agreement," it would "seek all available remedies under the law for that breach."

Letter 3: Penthol did not immediately respond to Vertex's letter. On January 27, eight days after its January 19 correspondence, Vertex sent a follow-up letter expressing that because "Penthol has not withdrawn its December 18, 2020 termination notice," Vertex "considers the Agreement terminated, albeit wrongfully by Penthol." Vertex then demanded, in accordance with Section 7.2 of the sales agreement, that Penthol pay all owed commissions within two days.

Vertex also took steps to terminate the sales relationship after issuing the January 27 letter. As the district court observed, "Vertex cut off Penthol's access to [a] shared workbook and told customers that Vertex was no longer selling ADbase on behalf of Penthol." Findings of Fact & Conclusions of Law, 722 F.Supp.3d at 682.

Letter 4: Penthol responded on January 29. It maintained that Vertex breached the sales agreement by selling a product that met the specifications of a Group III base oil, "agree[d] with Vertex that the Agreement has been

terminated under section 7.1," and criticized Vertex's 48-hour repayment demand as unreasonable.

Letter 5: Penthol "follow[ed] up" on its January 29 correspondence with a letter on February 4. In that letter, Penthol wrote that based on "the exchange of" the January 27 and 29 letters, the parties "mutually agreed that the Agreement has been terminated under section 7.1(d)." Penthol also demanded that Vertex comply with the wind-down procedures outlined in the sales agreement.

On February 8, 2021, Penthol sued Vertex in the federal district court for the Southern District of Texas. Penthol alleged violations of the Sherman Act, contractual breaches associated with the sales agreement, business disparagement, and misappropriation of trade secrets. Vertex counterclaimed by alleging breach of contract and tortious interference with existing business relationships.

Only two claims, for breach of contract and misappropriation of trade secrets, proceeded to a bench trial, which began on October 30, 2023. On the evening before the trial, Penthol moved to strike what it described as Vertex's "unpled counterclaim of repudiation" from a proposed joint pretrial order. The district court took the matter under advisement and later rejected Penthol's motion.

After the bench trial, the district court issued findings of fact and conclusions of law in Vertex's favor on the breach of contract and trade secret misappropriation claims. Findings of Fact & Conclusions of Law, 722 F.Supp.3d at 669–79. But, as for the parties' competing theories on who was responsible for terminating the sales agreement, the district court found that Penthol neither triggered nor initiated an anticipatory breach by issuing Letter 1. Instead, it found that Vertex triggered the contract's termination

through Letter 3, and that Letter 4, from Penthol, confirmed that termination. *Id.* at 679–86.

As for damages and costs, the district court concluded that "regardless of whether [the dissolution of the sales agreement] was a mutual termination or not, Vertex is entitled to a 'true-up,' unpaid commission and unpaid performance incentives through 2020." *Id.* at 686–87. It accordingly awarded Vertex $1,396,713 in damages, to be paid by Penthol.[4] *Id.* at 687–88. But the district court denied Vertex's invocation of the sales agreement's fee-shifting provisions, reasoning that because the contract "was mutually terminated, neither [party] is deemed the defaulting or non-defaulting party." *Id.* at 686. In a post-judgment order, the district court also denied Vertex's request for costs typically awarded to a prevailing party pursuant to Rule 54(d) of the Federal Rules of Civil Procedure. *Penthol, LLC v. Vertex Energy Operating, LLC*, No. 4:21-CV-416, 2024 WL 3166936, at *2–*4 (S.D. Tex. June 25, 2024) (the "Post-Judgment Order").

Vertex timely appealed and seeks: (1) a finding that Penthol repudiated the sales agreement, (2) reversal of the denial of legal fees associated with a default provision in the sales agreement, and (3) reversal of the denial of costs that are typically awarded to a prevailing party in federal litigation. Penthol urges affirmance of the decision below.

## II.

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Barto v. Shore Const., L.L.C.*, 801 F.3d 465, 471 (5th Cir. 2015) (quoting *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 (5th Cir. 2009)). As for Rule 54(d)

---

[4] This figure is composed of $485,908 in unpaid commissions and $910,805 in unpaid performance incentives.

fee disputes, "the district courts have broad discretion in taxing costs of court, and we will reverse only upon a clear showing of abuse of discretion." *Alberti v. Klevenhagen*, 46 F.3d 1347, 1358 (5th Cir. 1995).

## III.

Vertex chiefly contends that the district court erred in declining to find that Penthol repudiated the sales agreement. Specifically, it argues that Penthol, by delivering Letter 1, initiated an anticipatory breach because the letter threatened termination unless Vertex agreed to "extra-contractual performance—that Vertex stop selling VTX-6 because of anomalous instances of a higher viscosity index." Under Vertex's theory, Penthol ultimately "committed an anticipatory repudiation" by "refus[ing] to reconsider" its threat of termination between Vertex's issuance of Letters 2 and 3.

To prevail on an anticipatory breach claim under Texas law, "a plaintiff must establish each of the following elements: (1) an absolute repudiation of the obligation; (2) a lack of a just excuse for the repudiation; and (3) damage to the non-repudiating party." *Gonzalez v. Denning*, 394 F.3d 388, 394 (5th Cir. 2004) (per curiam) (citing *Taylor Pub. Co. v. Sys. Mktg. Inc.*, 686 S.W.2d 213, 217 (Tex. App.—Dallas 1984, writ ref'd n.r.e.)).

### A.

Our analysis begins, and quickly ends, with the first element because Letter 1 did not constitute an "absolute repudiation" of Penthol's contractual obligations. *Gonzalez*, 394 F.3d at 394. "[I]t has long been the law in Texas that before there can be an anticipatory breach, there must be an *unconditional declaration* of an intention not to perform the contract." *Davis v. Canyon Creek Ests. Homeowners Ass'n*, 350 S.W.3d 301, 313 (Tex. App.—San Antonio 2011, pet. den.) (emphasis added, collecting cases). "To constitute a repudiation, a party to a contract must have absolutely and

unconditionally refused to perform the contract without just excuse." *El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2003, rev. den.).

Letter 1 does not evince Penthol's "absolute" or "unconditional" refusal to perform its contractual obligations. The termination threat, found in the letter's second substantive sentence, reads: "If Vertex does not cure the defaults described below within thirty (30) Business Days after receipt of this Notice, Penthol will terminate the Agreement pursuant to section 7.1(b)." Two attributes counsel against reading this sentence as an "absolute[] and unconditional[] refus[al]" of Penthol's contractual obligations: the threat is both conditional, in that it is dependent on Vertex's failure to cure an alleged breach, and prospective, in that it may occur after a 30-business day period. *Id.*

Vertex counters by stressing that the non-immediate nature of a threat, such as a "termination of the [sales agreement] in the future," does not negate its repudiatory effect. It points to Texas caselaw for the proposition that repudiation "may consist of either words or actions by a party to a contract that indicate an intention that he or she is not going to perform the contract according to its terms *in the future*." *Id.* (quoting *Builders Sand, Inc. v. Turtur*, 678 S.W.2d 115, 120 (Tex. App.—Houston [1st Dist.] 1984, no pet. (emphasis added)). That proposition is substantively correct in isolation. But it is inaccurate to characterize Letter 1 as correspondence that conveyed an imminent—that is, forthcoming and certain—repudiation; as noted above, the conditional nature of Penthol's warning is also relevant to this analysis.

Likely aware of this, Vertex also casts Penthol's demand as extra-contractual and explains that repudiation can occur when a party "demands of the other a performance to which he has no right under the contract and

states definitely that unless his demand is complied with he will not render his promised performance" (quoting *In re Windmill Run Assocs., Ltd.*, 566 B.R. 396, 445–46 (Bankr. S.D. Tex. 2017)). That principle is again substantively correct, but Letter 1 can hardly be characterized as seeking extra-contractual performance. The letter requested that Vertex stop selling a non-ADbase product that met Group III base oil specifications because that alleged act violated the sales agreement's noncompete clause. Succinctly stated, Letter 1 neither constituted nor served as the starting point for a repudiation, because Penthol's threat of nonperformance was neither absolute nor unconditional.

## B.

At its core, Vertex's repudiation theory is that Penthol committed an anticipatory breach by failing to withdraw its threat of termination at some point between Letters 2 and 3. We are unpersuaded for three reasons.

First, the approach runs contrary to the central element of a repudiation: "an unconditional declaration of an intention not to perform the contract." *Davis*, 350 S.W.3d at 313. Vertex's theory places the act of repudiation, where a party renounces its contractual obligations, in the control of a non-repudiating party. That view endorses a questionable outcome: somehow, Vertex managed to trigger Penthol's alleged repudiation by determining that Penthol had "not change[d] its position after Vertex's outreach." But at least under ordinary circumstances, non-repudiating parties cannot arrogate to themselves the ability to determine when and how a repudiating party has renounced its contractual obligations.

Second, and from a judicial perspective, Vertex's theory makes the exact moment of repudiation difficult to pinpoint. Vertex asserts that repudiation occurred once "Penthol[] refus[ed] to reconsider after Vertex's January 19 letter." But that description is vague and illusory: it fails to

identify when Penthol's consideration of Letter 2 transformed from acceptable contemplation to unacceptable repudiation. Nor does it explain why Vertex is the party that is able to determine when Penthol has apparently repudiated its contractual obligations.

Third, Vertex's theory is refuted by the contractual rights and procedures that Penthol invoked when threatening termination. As noted above, Letter 1 was issued pursuant to "section 7.1(b)" of the parties' sales agreement and provided a 30-business day period for Vertex to cure the alleged breach and for Penthol to evaluate its options. Section 7.1(b) of the parties' agreement provided:

> 7.1 Early Termination Events. This Agreement is subject to termination as follows:
>
> (b) Either Party shall have the right to terminate this Agreement upon (i) the failure of a Party to make, when due, any payment required pursuant to this Agreement if such failure is not remedied within ten (10) Business Days after receipt of a Notice; or (ii) the failure of a Party to perform any material covenant or obligation set forth in this Agreement if such failure is not remedied within thirty (30) Business Days after receipt of a Notice specifically describing the nature of the default; provided, however, that in the event the alleged default is cured within such thirty (30) day period, this Agreement shall remain in full force and effect and not be terminated as a result of such default.

Penthol's right to terminate the contract only ripened "if [the alleged] failure [was] not remedied within thirty (30) Business Days after receipt of a Notice specifically describing the nature of the default." Thus, as the district court concluded, Penthol could not repudiate until February 4, 2021. Findings of Fact & Conclusions of Law, 722 F.Supp.3d at 681. That date, which

represents the earliest date that Penthol could repudiate in accordance with the sales agreement, was at least a week after Vertex issued Letter 3.[5]

*Scientific Machine*, a case that Vertex substantially relies upon in its briefing, does not counsel a different outcome. *Sci. Mach. & Welding, Inc. v. FlashParking, Inc.*, 641 S.W.3d 454, 457 (Tex. App.—Austin 2021, rev. den.). Vertex contends that the court's decision there stands for two connected propositions: a repudiation occurs (1) "when [a party] refuse[s] to sign a required, additional contract without unagreed, material changes" (citing *Scientific Machine*, 641 S.W.3d at 467–68), and (2) the non-repudiating party "reject[s] the extra-contractual demand and ask[s] the counterparty to confirm whether it would perform the contract or not" (citing *id.* at 465). But as detailed above, Letter 1 did not seek an extra-contractual action. Rather, Penthol sought curation of an alleged—but mistaken—breach of the noncompete clause in the parties' agreement. And separately, as Penthol points out, *Scientific Machine* did not involve a situation "where a party followed the notice and termination procedure mandated by the parties' contract." *See id.* at 458–60.

## C.

All of this analysis culminates in one final question: if not through Penthol's repudiation, how was the sales agreement terminated? The district court found that the severance was mutual: "both sides agreed to a termination, perhaps with each side motivated by incorrect assumptions or

---

[5] Vertex argues that Letter 4, where Penthol confirmed that the agreement was terminated, "places beyond debate" that the company was uninterested in curative actions. That argument both (1) misses the point, in that Penthol had the contractual right to evaluate Vertex's correspondence and curative actions until at least February 3, and (2) ignores that Penthol was responding to Vertex's present-tense declaration that it considered the contract terminated.

suspicions." Findings of Fact & Conclusions of Law, 722 F.Supp.3d at 685. It specified that Letter 3, issued by Vertex, was "the first time one of the parties, in the present tense, actually considered the contract terminated." *Id.* The district court then concluded that termination was finalized when Penthol issued Letter 4, which agreed with Vertex's position "that the Agreement has been terminated under section 7.1 of the Agreement." *Id.*

Vertex disputes this framing of events. It avers that while Letter 3 "actually considered the contract terminated," it "*was not* agreeing that the [agreement] should be terminated. [Rather,] Vertex was acknowledging that Penthol's words and conduct constituted a repudiation, and Vertex was accepting that repudiation as wrongful termination." But for the reasons discussed above, Penthol's correspondence and conduct did not amount to a repudiation in the first place. Vertex's January 27 letter—the first "present tense" statement that suggested termination of the contract—thus functioned as an offer to terminate the contract.[6]

Second, Vertex stresses that the first time that Penthol mentioned mutual termination was in a "self-serving February 4 letter," and that at the time of the agreement's alleged dissolution, on January 29, Vertex had not agreed that the agreement "should be terminated without liability to Penthol." But that argument is a red herring: the key point about the January 29 date is that Vertex agreed that the contract was dissolved—even as the parties disagreed as to who was responsible for its termination.

---

[6] Vertex notes that its "witnesses all testified at trial that they did not want the [sales agreement] to terminate early." But that argument violates a bedrock principle of contracts law: "[m]utual assent is based on objective evidence, not the private, undisclosed thoughts of the parties." *MRC Permian Co. v. Three Rivers Operating Co.*, No. 05-14-00353-CV, 2015 WL 4639711, at *7 (Tex. App.—Dallas Aug. 5, 2015, no pet.) (citation omitted).

No. 24-20329

At bottom, Vertex and Penthol contracted to ensure that prior to any early termination of the sales agreement, a breaching party would have a 30-business day period to cure any errors, and an accusing party would have the same period to evaluate the situation and either follow through on termination or continue on with the contract. Vertex unilaterally acted before the conclusion of that period, and before Penthol's right of repudiation materialized, to terminate the contract. We accordingly agree with the district court's conclusion that "Vertex exercised a preemptive strike" by giving notice of termination in Letter 3, and that the termination of the sales agreement mutually occurred shortly thereafter. Findings of Fact & Conclusions of Law, 722 F.Supp.3d at 682 n.8.[7]

## IV.

Separate from its repudiation-related arguments, Vertex challenges the district court's denial of attorneys' fees and litigation costs. In its findings of fact and conclusions of law, the district court found that Vertex was entitled to over $485,000 in unpaid commissions and over $910,000 in unpaid performance incentives. *Id.* at 686–87. But it also concluded that because the agreement's termination was mutual, there were no "non-defaulting part[ies]," and accordingly, neither party was entitled to "attorneys' fees and costs" in accordance with a fee-shifting provision in the sales agreement. *Id.* at 687. Later, in a separate post-judgment order, the district court found that Vertex was not entitled to prevailing party costs under Rule 54(d) of the Federal Rules of Civil Procedure because the dispute

---

[7] Because we conclude that Penthol did not commit an anticipatory repudiation in the first place, we do not address the company's alternative theories for affirming the district court's conclusion—that (1) Vertex may have waived its repudiation theory by only specifying it in a pretrial order, or (2) Penthol had a "just excuse" even if it committed an anticipatory repudiation.

involved "fact intensive" issues and "legally somewhat perplexing" courses of conduct by both parties. Post-Judgment Order, 2024 WL 3166936, at *4. We review each finding in turn.

## A.

Vertex alleges that regardless of how the sales relationship terminated, it is entitled to "actual, reasonable out-of-pocket expenses," including "reasonable legal fees and expenses," as a "non-defaulting Party" under Section 7.2 of the sales agreement. The company specifically points to the district court's conclusion that Penthol owed "unpaid commissions and unpaid performance incentives through 2020." Findings of Fact & Conclusions of Law, 722 F.Supp.3d at 686–87. Penthol, meanwhile, argues that the structure of the agreement's termination-related provisions favors the district court's denial of fees.

To start, Sections 7.1(b), (c), (d), and 7.2 are reproduced below:

7.1 Early Termination Events. This Agreement is subject to termination as follows:

(b) Either Party shall have the right to terminate this Agreement upon (i) the failure of a Party to make, when due, any payment required pursuant to this Agreement if such failure is not remedied within ten (10) Business Days after receipt of a Notice; or (ii) the failure of a Party to perform any material covenant or obligation set forth in this Agreement if such failure is not remedied within thirty (30) Business Days after receipt of a Notice specifically describing the nature of the default; provided, however, that in the event the alleged default is cured within such thirty (30) day period, this Agreement shall remain in full force and effect and not be terminated as a result of such default; or

(c) Penthol gives a Notice as provided in Section 4.7(a); or

(d) The Parties mutually agree to terminate this Agreement.

7.2 <u>Termination Rights</u>. The Parties agree that within a commercially reasonable time after termination of this Agreement as provided in <u>Section 7.1</u>, the Parties will settle and liquidate all transactions and obligations entered into pursuant to this Agreement in an orderly and commercially reasonable manner. The non-defaulting party shall be entitled, in its sole discretion, to set-off any amount payable by the non-defaulting Party to the defaulting Party under this Agreement or otherwise, against any amounts payable by the non-defaulting Party to the defaulting Party under this Agreement or otherwise. The defaulting Party shall reimburse the non-defaulting Party, on demand, for actual, reasonable out-of-pocket expenses (with interest at the Interest Rate), including, without limitation, reasonable legal fees and expenses incurred by the non-defaulting Party in connection with the enforcement of the non-defaulting Party's rights and remedies. The non-defaulting Party's rights under this <u>Section 7.2</u> shall be in addition to any and all rights and remedies such Party may have under Applicable Law or in equity, except as such rights may be limited by the express terms hereof, including, without limitation, <u>Section 8.4</u>.

With these provisions in mind, Vertex makes a three-pronged argument. First, it highlights that Section 7.2 expressly entitles a "non-defaulting party" to receive reasonable expenses from a "defaulting party" for all forms of termination "provided in Section 7.1," including mutual termination. Second, it notes that while "default" and "defaulting" are not defined by the sales agreement, the ordinary meaning of the term is a "failure to perform a contractual obligation," *see* Default, BLACK'S LAW DICTIONARY (12th ed. 2024). Third, it emphasizes that the district court concluded that Penthol failed to perform certain contractual obligations and awarded Vertex over a million dollars for unpaid commissions and performance incentives. Putting the prongs together, Vertex asserts that the

district court's conclusion literally makes Penthol a defaulting party under the plain meaning of "default."

Penthol responds by claiming that the district court's denial of costs was proper. It begins by noting that within the eight-section contract, there are only two substantive sections that mention "default": Sections 7.1 and 7.2. Next, it theorizes that because Section 7.1, which details termination methods, is the only other contractual provision that mentions a "default," the term ought to be construed in the context of a termination. Penthol then points out that among the multiple termination methods within Section 7.1, only the one in Section 7.1(b)(ii) mentions "default," and accordingly, there can only be a contractual "default" if there is a termination pursuant to that provision. In Penthol's view, because Vertex neither invoked Section 7.1(b)(ii) nor gave any 30-business day period for Penthol to cure its default, Penthol cannot be a "non-defaulting party."

We conclude that Vertex's interpretation is correct, and Penthol's reading is problematic. *Cf. Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 728 (Tex. 2001) ("An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; for an ambiguity to exist, both interpretations must be reasonable."). Penthol's reading is premised on the argument that "default" is a special term of art that is confined to Section 7.1(b)(ii)'s provisions. But the parties chose not to separately define the term, and the entirety of Section 7.1(b)(ii) appears to equate a "default" with "the failure of a Party to perform any material covenant or obligation set forth in th[e] Agreement."

Treating "default" and "failure of a Party to perform any material covenant or obligation" as synonyms is also consistent with the plain meaning of the term. "We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in

a technical or different sense." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *see also NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 466 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("We therefore give terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning."). And separately, Penthol's reading restricts Section 7.2's cost-shifting provision to the subset of terminations that occur under Section 7.1(b)(ii). That position runs contrary to the plain text of Section 7.2, which applies to all forms "of termination . . . as provided in Section 7.1." In interpreting a contract, the court's role is to "attempt[] to give effect to all provisions." *James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 403 (Tex. 2022).

The district court issued a contrary opinion, concluding that "neither party is the defaulting or non-defaulting party under [Section] 7.2." Findings of Fact & Conclusions of Law, 722 F.Supp.3d at 688. Penthol accordingly insists that if Vertex were to be awarded fees, we would first have to remand to the district court for additional factfinding. But "[i]nterpretation of an unambiguous contract is a question of law and [Texas appellate courts] are not required to defer to any interpretation afforded by the trial court." *Alamo Cmty. Coll. Dist. v. Browning Constr. Co.*, 131 S.W.3d 146, 155 (Tex. App.—San Antonio 2004, pet. den.).

And here, the district court made a legal error: it concluded that because "the [agreement] was mutually terminated, neither Penthol nor Vertex is deemed the defaulting or non-defaulting party . . ." Findings of Fact & Conclusions of Law, 722 F.Supp.3d at 686. That finding rests on the incorrect assumption that mutual termination and default are antipodal and exclusive principles. But as Vertex points out, the concepts are not mutually exclusive: parties can agree to mutually terminate a contract after one party defaults on its obligations; the mutuality of that termination would not affect the fact that one party defaulted on its work. We accordingly VACATE the

portion of the district court's order that denies Vertex's request, under Section 7.2(b), for "actual, reasonable out-of-pocket expenses . . . in connection with the enforcement of the non-defaulting Party's rights and remedies," and REMAND to the district court for further proceedings.

## B.

The district court also declined Vertex's request for prevailing party costs under Federal Rule of Civil Procedure 54(d) for a trio of reasons: a "finding of good faith, the finding that both parties were partially wrong and partially right in the termination process, and the existence of complicated, novel, and difficult issues of contract law." Post-Judgment Order, 2024 WL 3166936, at *4. Vertex asserts that if the panel finds any error among the appealed issues, it should reverse and remand the district court's determination that Vertex was not entitled to costs under Rule 54(d) because "the district court's decision rests on the same errors involving mutual termination and the availability of fees and expenses under the" sales agreement.

Vertex's characterization of the district court's Rule 54(d) determination is incomplete. The district court offered a robust explanation for denying Vertex's request for prevailing party costs:

- It acknowledged that "there is a strong presumption under Rule 54(d)(1) that the prevailing party will be awarded costs," but that the decision remains "within the Court's discretion, so long as the court provides reasons for its decision."

- It highlighted this court's opinion in *Pacheco v. Mineta*, 448 F.3d 783 (5th Cir. 2006), which outlined various considerations for withholding costs, including "close and difficult legal issues presented" and a losing party "prosecut[ing] the action in good faith."

- It concluded that while Vertex prevailed on its breach-of-contract and trade secret misappropriation causes, Penthol brought the action in good faith, <u>and</u> that the "central issues discussed at trial" were "complex and difficult [in] nature."

- It specified that among the central issues (competition and wrongful termination), the first "was fact intensive," and the "second was legally somewhat perplexing" given the oddities of the parties' actions.

- It also noted that the portions of the case that Vertex was awarded damages for—unpaid commissions and performance incentives—"only account[ed] for two pages of the 39-page" findings of fact and conclusions of law.

Post-Judgment Order, 2024 WL 3166936, at *3–*4. "[T]he district courts have broad discretion in taxing costs of court, and we will reverse only upon a clear showing of abuse of discretion." *Alberti*, 46 F.3d at 1358. Contrary to Vertex's characterization, the district court issued a well-reasoned explanation as to why it denied prevailing party costs, and its justification are consistent with the *Mineta* considerations. *See Mineta*, 448 F.3d at 794. We accordingly AFFIRM the district court's denial of prevailing party fees under Rule 54(d) of the Federal Rules of Civil Procedure.

## V.

For the reasons discussed above, we AFFIRM the district court's determination that Penthol did not commit an anticipatory breach and AFFIRM the denial of Vertex's request for prevailing party fees under Rule 54(d) of the Federal Rules of Civil Procedure. However, we VACATE the district court's denial of attorneys' fees pursuant to Section 7.2(b) of the parties' agreement, and REMAND for additional proceedings consistent with this opinion.