

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00630-CV

———————————————

PRO HEALTH, LLC, Appellant

V.

ELITE JET SOLUTIONS, LLC, Appellee

---

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-316499-20

---

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Bassel

**MEMORANDUM OPINION**

## I. Introduction

This is the second appeal from the parties' dispute regarding whether their Aircraft Brokerage Listing Agreement (the Listing Agreement) required Appellant Pro Health, LLC to pay a commission to Appellee Elite Jet Solutions, LLC (Broker).[1] Broker claimed that it did, and when Pro Health did not pay, Broker sued Pro Health for breach of contract.

After the parties filed their initial competing motions for summary judgment that turned on the Listing Agreement's interpretation, the trial court concluded that a specific provision of the Listing Agreement—a provision requiring payment of a commission for sales to certain buyers that occurred within ninety days after the Listing Agreement's termination—unambiguously required Pro Health to pay Broker a commission. In the trial court's letter ruling, it detailed its interpretation of the ninety-day provision, and Pro Health challenged that interpretation in its first appeal, highlighting the ways in which it was inconsistent with the remainder of the Listing Agreement and pointing out that the trial court's written explanation conspicuously added commas that materially affected the ninety-day provision's meaning. We agreed that the trial court's addition of dispositive commas was erroneous; thus, we

---

[1]Because this is the second appeal from the same Listing Agreement, we borrow from our prior opinion, especially when detailing the background, and set forth that citation here once to avoid repetition. *See Pro Health, LLC v. Elite Jet Sols., LLC*, No. 02-23-00111-CV, 2024 WL 1670900, at *1–2 (Tex. App.—Fort Worth Apr. 18, 2024, no pet.).

held that the ninety-day provision's ambiguity precluded summary judgment, and we reversed the first summary judgment and remanded for further proceedings.

On remand, Broker again moved for traditional summary judgment but this time relied on two provisions in the Listing Agreement that required the sale to occur during the listing period—one provision required payment of a commission if Broker "sold" the aircraft (even if Broker did not negotiate the deal) during the listing period and another required payment of a commission if any "sale of the Aircraft" occurred during the listing period. Pro Health countered that conclusive evidence showed that the aircraft was not sold until after the listing period had expired because title was not transferred to the purchaser until five days after the Listing Agreement terminated. The trial court granted Broker summary judgment a second time, and it is from that judgment that Pro Health now appeals.

In two broad issues,[2] Pro Health argues that the trial court erred by concluding that it had breached the Listing Agreement and by incorporating the reversed 2023 final judgment into the 2025 final judgment. Because Broker did not conclusively establish that it was entitled to summary judgment under either of the provisions that it relied on and on the summary-judgment grounds that it raised, the trial court erred

---

[2]In the "Issues Presented" section of its brief, Pro Health lists three issues. But in its argument section, it groups its first and second issues together and attacks the trial court's ruling that Pro Health breached the Listing Agreement. We follow the format that Pro Health uses in its argument section.

3

by granting Broker's summary-judgment motion. Accordingly, we again reverse and remand for further proceedings.

## II. Background

The Listing Agreement gave Broker the exclusive right "to sell" an aircraft owned by Pro Health, while Pro Health agreed to pay Broker a specified commission of $75,000.00 if one of several triggering events occurred. Most of the triggering events were limited to the listing period, with one exception for sales to certain buyers that occurred within ninety days after the Listing Agreement's termination.

Specifically, the ninety-day provision required "Owner [to] pay Broker the . . . commission in the event of . . . any sale of the Aircraft within ninety (90) days after termination of th[e] Agreement to anyone with whom Broker or his agent or representative of the undersigned ha[d] negotiated with during the period of th[e] Agreement." The Listing Agreement defined "Owner" as Pro Health and "Broker" as Elite Jet Solutions.

After the parties signed the Listing Agreement, several months passed without a sale, until Pro Health gave written notice terminating the Listing Agreement. Pursuant to the terms of the Listing Agreement, it continued for thirty days after written notice of termination was given, making the termination date and the last day of the listing period October 20, 2019.

On October 17, 2019, Pro Health entered into an Aircraft Purchase Agreement (the Purchase Agreement) with a third party with whom Pro Health's owner had

4

begun talking while the Listing Agreement was still in effect; Broker was not involved in those discussions. The Purchase Agreement provided that closing would occur on a date agreed upon in writing by Pro Health and the Purchaser, that the aircraft would be tendered to the Purchaser at closing, and that title would be transferred to the Purchaser at closing. The funds for the aircraft's purchase were received into escrow on October 25, 2019, and the title company requested authorization to close from Pro Health and the Purchaser. The parties provided their written agreement to close on October 25, 2019, and the closing occurred on that date. Pro Health did not pay Broker a commission.

Broker claimed that it was entitled to a commission for the aircraft's sale, so it sued Pro Health for breach of contract, among other claims.[3] Both parties moved for traditional summary judgment on Broker's contract claim, each arguing that the Listing Agreement unambiguously required judgment in its favor.

Initially, the trial court granted summary judgment for Broker, and in its letter ruling explained that

> [S]ubsection (c) [i.e., the 90-day provision] . . . mandates payment if the "Broker[,] or his agent[,] or representative of the *undersigned* . . . negotiated" with the purchaser during the period of the Agreement (emphasis and punctuation added). The above sentence identifies the Broker, follows that up with the term "his," obviously referring to the Broker, and then uses the term "undersigned." The use of the term "undersigned" in the same sentence that twice identifies the Broker

---

[3]Broker also sued Pro Health's owner, but it later nonsuited its claims against him.

5

suggests that the term either refers to the Owner or both parties that have signed the Agreement. [Alterations in original.]

Because Pro Health was included in this interpretation of the term "undersigned," and because it had talked with the Purchaser while the Listing Agreement was still in effect, the trial court concluded that the ninety-day provision required Pro Health to pay Broker a commission for the sale. It subsequently rendered a final judgment that incorporated its summary judgment, and it awarded Broker attorney's fees and costs.

Pro Health appealed, challenging the trial court's insertion of commas into the ninety-day provision and its grant of summary judgment premised upon an interpretation that utilized its changes to the provision. As noted above, we agreed that the trial court's addition of dispositive commas was erroneous, held that the ninety-day provision's ambiguity precluded summary judgment, and reversed the summary judgment and remanded for further proceedings.

On remand, Broker took a new tack and filed another motion for summary judgment seeking a commission based on Pro Health's alleged breach of two other provisions in the Listing Agreement relating to Broker's commission if the sale occurred within the listing period. Those provisions are found in Paragraphs 3 and 6(a) of the Listing Agreement:

> 3. In the event the Aircraft is sold by Broker within the listing period stated above, regardless if the sale is negotiated by Broker or directly by Owner, Owner agrees and promises to pay Broker a commission of $75,000.00. paid at closing/title transfer. . . .
>
>     . . . .

6

6. It is further agreed Owner will pay Broker the aforementioned commission in the event of. (a) Any sale of the Aircraft during the listed period hereof . . . .[4]

Broker argued that it had performed as contractually required, that Pro Health had breached the Listing Agreement by not paying Broker a commission, that Pro Health had "intentionally sought to prejudice [Broker]'s right to the [c]ommission," and that Broker had sustained damages due to Pro Health's breach. Broker claimed that it had engaged in "various discussions, negotiations, and communications regarding the sale of the [a]ircraft"; that "[i]t is undisputed that . . . the [a]ircraft was sold during the term of the Listing Agreement"; and that Pro Health had committed anticipatory breach by selling the aircraft before the listing term had expired. Broker relied on statements from Pro Health's owner that he had purposely delayed the closing so that he would not have to pay Broker a commission.

Broker attached a copy of the October 17, 2019 Purchase Agreement between Pro Health and the aircraft's Purchaser but made no mention of the following provisions:

- "Closing shall occur on a date agreed upon in writing by Purchaser and Seller."

- "Seller shall deliver and Purchaser shall accept the Aircraft in Wichita, KS[,] . . . or at any other location agreed upon in writing by Purchaser

---

[4]The period after $75,000.00 in Paragraph 3 and the period after "of" in Paragraph 6(a) appear to be typos in the Listing Agreement.

7

and Seller. . . .  On the Closing Date, the Aircraft shall be tendered to Purchaser . . . ."

- "At Closing, Aircraft title shall be transferred to Purchaser free and clear of all Liens."

Broker also attached emails between the escrow company, Pro Health's owner, and the Purchaser, stating that the funds were received into escrow on October 25, 2019, and that Pro Health and the Purchaser had given written authorization to close on that date.

Pro Health responded to Broker's anticipatory-breach argument by claiming that there was "no anticipatory breach as Pro[ ]Health [had] let [Broker] have the entire period of the . . . Agreement to perform and bring a buyer," but Broker never procured a buyer for the aircraft, and Pro Health did not make "any statement or representation that it would not pay [Broker] its commission *if* it produced a buyer within the [l]isting [p]eriod."  Pro Health stated in its response that Broker's assertion that it is entitled to a commission solely because the aircraft allegedly "sold" within the listing period is not only disputed but is demonstrably false.  Pro Health explained that a sale is "the passing of title from the seller to the buyer for a price,"[5] that the Purchase Agreement did not transfer title, and that conclusive evidence showed that

---

[5] *See* Tex. Bus. & Com. Code § 2.106(a) (defining sale using the same language quoted by Pro Health).

the aircraft was not sold until after the listing period had expired as title was not transferred to the Purchaser until October 25, 2019.[6]

Broker filed a reply[7] arguing that Paragraph 3 of the Listing Agreement provided two separate and distinct dates—the sale was required to take place during the listing period while the commission would be paid at closing/title transfer. Broker contended that giving effect to the entirety of Paragraph 3 "leaves no doubt that the parties viewed and intended the sale of the aircraft as having been complete when the . . . Purchase Agreement was entered into" with the buyer and that the "later purely administrative date of 'closing'" was a separate and independent date upon which the commission would be paid. Broker further asserted that Pro Health "could have easily proceeded to closing on or before October 20, 2019," because the escrow company indicated to the Federal Aviation Administration on October 18, 2019, that it was in possession of every document required to close the transaction.

After hearing arguments, the trial court signed a final judgment granting Broker's summary-judgment motion on its "claims for breach of contract, and declaratory judgment, specifically for [Pro Health's] breach of the [Listing] Agreement." The trial court granted Broker $75,000 in actual damages and awarded

---

[6]Pro Health also filed objections to Broker's summary-judgment evidence on the same day as the summary-judgment hearing. The trial court overruled Pro Health's objections in their entirety.

[7]Broker's summary-judgment reply mentions its "Original Petition, as amended," but there is no such amended petition in the record and none is listed on the imaged transaction list from the trial court that is included in the appellate record.

prejudgment and postjudgment interest, as well as attorneys' fees. The final judgment further stated, "The summary judgment previously ordered by this [c]ourt is hereby incorporated into this [f]inal [j]udgment."

This appeal followed.

### III. Broker Did Not Conclusively Establish It Was Entitled to Summary Judgment

In the initial part of its first issue, Pro Health contends that the trial court erred by granting Broker summary judgment because the aircraft was not sold during the listing period and because the Purchaser was one that Pro Health exclusively secured and with whom Broker had no contact, communications, or negotiations. Specifically, Pro Health argues that no sale occurred during the listing period under the Uniform Commercial Code's definition of "sale." We agree.

### A. Standard of Review and Governing Law

We review a summary judgment de novo. *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 218 (Tex. 2022); *Parker Cnty. Appraisal Dist. v. Bosque Disposal Sys., LLC*, 506 S.W.3d 665, 667 (Tex. App.—Fort Worth 2016), *aff'd*, 555 S.W.3d 92 (Tex. 2018). A party moving for traditional summary judgment must conclusively establish that it is entitled to summary judgment as a matter of law. *See* Tex. R. Civ. P. 166a(a)(1); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

10

Here, the summary-judgment grounds ruled upon turn on the language of the Listing Agreement. The presence of ambiguity and the interpretation of a contract are questions of law, which we review de novo. *Devon Energy Prod. Co. v. Sheppard*, 668 S.W.3d 332, 343 (Tex. 2023); *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018) (noting that "[a] contract . . . may be ambiguous even though the parties agree it is not"); *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (op. on reh'g) ("Whether a contract is ambiguous is a question of law for the court to decide . . . .").

When interpreting a contract, our "primary objective . . . is to ascertain and give effect to the parties' intent as expressed in the instrument." *U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 387 (Tex. 2023) (internal quotation marks omitted) (quoting *URI*, 543 S.W.3d at 763). We "'presume parties intend what the words of their contract say' and interpret contract language according to its 'plain, ordinary, and generally accepted meaning.'" *URI*, 543 S.W.3d at 764 (first quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) (op. on reh'g); and then quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) (footnotes omitted)); *see Rosetta Res. Operating*, 645 S.W.3d at 219 (similar). We seek to harmonize the entire contract, avoiding constructions that would render any words or provisions meaningless. *See Rosetta Res. Operating*, 645 S.W.3d at 219; *Gilbert Tex. Constr.*, 327 S.W.3d at 126.

11

If a contract "can be given a definite or certain legal meaning," then it is unambiguous and must be enforced as written. *URI*, 543 S.W.3d at 765; *see Gilbert Tex. Constr.*, 327 S.W.3d at 133; *Heritage Res.*, 939 S.W.2d at 121. But if a contract "is reasonably susceptible to more than one interpretation," an ambiguity exists, and "the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Rosetta Res. Operating*, 645 S.W.3d at 219 (quoting *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)); *URI*, 543 S.W.3d at 765.

Because the crux of this appeal is the meaning of the word "sale" in Paragraphs 3 and 6(a), we set forth the relevant statutory provisions governing a sale. As noted above, a sale is defined by statute as "the passing of title from the seller to the buyer for a price." Tex. Bus. & Com. Code § 2.106(a). Subject to certain provisions, "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." *Id.* § 2.401(a).

## B. Discussion

### 1. Paragraph 3 of the Listing Agreement is not ambiguous, and Broker failed to conclusively establish that the sale occurred during the listing period.

During its first attempt to have the case decided on summary judgment, Broker impliedly recognized that the aircraft's sale did not occur during the listing period. Broker therefore relied on the Listing Agreement's Paragraph 6(c)—which provided for a sale during the ninety days following the listing period—as grounds for obtaining a commission. After this court reversed the trial court's summary judgment

12

based on Paragraph 6(c), Broker performed an about-face of its interpretation of when the "sale" occurred and asserted mainly Paragraph 3, with a nod to Paragraph 6(a), as grounds for obtaining a commission. Because both of these provisions provide for a commission only if the sale occurred during the listing period, we begin our analysis by interpreting when the parties meant for a "sale" to be complete for purposes of the relied-on commission provisions.

Broker now argues that the terms of the Listing Agreement dictated that a sale occurred when Pro Health entered into the Purchase Agreement, even though the sale was not closed until later—a construction that is at odds with the ordinary definition of sale.[8] To impose this construction, Broker looks primarily to Paragraph 3[9] and argues that the provision carves out two dates—a date for the sale and a separate date for the closing: "In the event the Aircraft is **sold** by Broker within the listing period stated above, regardless if the sale is negotiated by Broker or directly by Owner, Owner agrees and promises to pay Broker a commission of $75,000.00. *paid at closing/title transfer.*" [Emphasis added by Broker.] Relying on its construction, Broker equates Pro Health's and the Purchaser's signing of the Purchase Agreement with a completed sale. Broker's effort to use the highlighted language to alter the conventional principles of when a sale occurs fails.

---

[8]Nothing in the contract as a whole indicates an intent to define the word "sale" differently than in the statute.

[9]Broker skips over the initial requirement of Paragraph 3—that it was required to sell the aircraft to obtain a commission. We will discuss this in more detail later.

13

The Texas Supreme Court has repeatedly noted the traditional view that a sale does not occur until title is transferred:

> Texas courts have long recognized that a sale requires a transfer: "[t]o constitute a sale of property, the title to, or property in, the thing, must pass from the seller to the buyer." *Cobb v. Tufts*, 2 Willson 141, 141 (Tex. Ct. App. 1884). Indeed, every sale must transfer property, and where no transfer occurs, nothing is sold. *L.H. Woods & Co. v. Half, Weiss & Co.*, 44 Tex. 633, 635 (1876). Similarly, Black's Law Dictionary defines "sale" as "[t]he transfer of property or title for a price." *Sale,* Black's Law Dictionary (11th ed. 2019). A "transfer" is "[a]ny mode of disposing of or parting with an asset or an interest in an asset." *Transfer*, Black's Law Dictionary (11th ed. 2019).

*Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 42 (Tex. 2020) (footnote omitted).

As Pro Health notes, the fact that a sale envisions the passage of title is embedded in Chapter 2 of the Uniform Commercial Code's definition of "sale" by providing that "[a] 'sale' consists in the passing of title from the seller to the buyer for a price (Section 2.401)." Tex. Bus. & Com. Code § 2.106(a). The Code provides an alternative term of "present sale" should the parties "mean[] a sale which is accomplished by the making of the contract." *Id.*

In order to adopt Broker's construction of the word "sale" in isolation, the trial court would have to read words into Paragraph 3: "In the event the Aircraft is sold by Broker *by Owner's entering into a purchase agreement for a present sale*[10] within the listing

---

[10]Broker's implied definition of sale—that the sale occurred upon the signing of the Purchase Agreement—corresponds to the Business and Commerce Code's definition of a "present sale." *See* Tex. Bus. & Com. Code § 2.106(a) (defining a "present sale" as a specific type of sale in which the passing of title is accomplished simultaneously with the making of the contract itself). But the Purchase Agreement

14

period stated above, . . . ." [Additional wording added in italics.] Trial courts are forbidden from adding to a contract,[11] and the prior summary judgment was reversed due to the trial court's additions to Paragraph 6(c).

A plain grammatical reading of the isolated word "sale" in Paragraph 3, however, shows that it is setting forth when the commission should be paid, not when a sale was completed; the only mention of a sale is to limit the timing to "within the listing period." The parties could have agreed to any date for the payment of the commission, but they agreed to have the commission-payment date occur on the same date as the "closing/title transfer," which is also referred to at the end of the paragraph as "sale closing/title transfer." The fact that the commission-payment date chosen by the parties was the closing/title transfer date does not in any way alter the meaning of "sale"; the payment of the commission was simply another task to be completed on the closing date.

---

here did not evidence an intent to make a present sale. Instead, it stated, "Seller hereby agrees to sell, transfer, and deliver to Purchaser; and Purchaser agrees to purchase assume from Seller, the rights and obligations of Seller to the Aircraft and the Assumed Liabilities . . . , subject to the terms and conditions set forth herein . . . ." Such language has been construed as evidencing an intent to make a future conveyance rather than a present conveyance. *See One Ford Mustang, VIN 1FAFP40471F207859 v. State*, 231 S.W.3d 445, 453 (Tex. App.—Waco 2007, no pet.) (holding as a matter of law that the contract language—"Seller . . . hereby sells and agrees to convey unto . . . Purchaser [the car]"—evidenced an intent and agreement to make a future sale rather than a present sale).

[11]*See Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 889 (Tex. 2021) ("As we have said time and again, courts may not rewrite a contract under the guise of interpretation.").

15

Further, Broker's argument suffers from another flaw. Broker's argument relies on its myopic reference in Paragraph 3 to the use of the word "sold" and ignores that the complete phrase using that word refers to the sale by a particular entity, i.e., when the Aircraft is "sold by Broker." Thus, one way to interpret the Listing Agreement is that Paragraph 3 does not address a sale by Pro Health at all. Instead, such a sale would be addressed by Paragraph 6(a), which merely refers to "[a]ny sale of the Aircraft during the listing period hereof." That language does not contain the potentially obfuscating language that Broker relies on in Paragraph 3 with its reference to "closing/title transfer." Thus, when we focus on the paragraph that seems more closely to control a sale by Pro Health, that paragraph does not even hint that it might be using the word "sale" in a way that is at odds with the conventional concept of when a "sale" occurs.

Applying the principles of contract construction and giving the language of the Listing Agreement its plain meaning, we hold that the Listing Agreement is worded so that it can be given a certain or definite legal meaning or interpretation such that it is not ambiguous.[12] Thus, giving the sale provisions in Paragraphs 3 and 6(a) their plain grammatical meanings, we conclude that the sale was completed when title transferred. *See* Tex. Bus. & Com. Code § 2.106(a).

---

[12]Alternatively, to the extent that Broker's argument can be read to assert that the Listing Agreement posed two meanings of "sale," it would be ambiguous, thus creating a fact issue prohibiting summary judgment. *See Coker*, 650 S.W.2d at 393–94.

Using the plain meaning of sale, we determine whether Broker's summary-judgment evidence conclusively established that the sale occurred during the listing period and conclude that it did not. The provisions in the Purchase Agreement, a document that Broker attached to its motion as summary-judgment evidence, underscore that Pro Health and the Purchaser were operating under the normal definition of a sale, which requires the passing of title to be complete. The Purchase Agreement made clear that title would transfer to the Purchaser on the closing date, as well as that the aircraft would be delivered on the closing date. Broker's other summary-judgment evidence showed that the closing occurred on October 25, 2019, and that the listing period terminated on October 20, 2019. Broker's summary-judgment evidence therefore conclusively established that the sale occurred after the listing period expired and that Broker could not claim a commission under Paragraph 3 or 6(a) due to the sale's not meeting the timing requirement. Accordingly, the trial court erred by finding that Pro Health had breached the Listing Agreement by not paying Broker a commission on a sale that occurred after the listing period had terminated.

### 2. Broker did not conclusively establish that Pro Health purposely delayed closing the sale of the aircraft.

In the next part of its first issue, Pro Health argues that if the trial court granted Broker summary judgment on the ground that Pro Health delayed the sale, the trial court erred by doing so because Pro Health had no contractual obligation to close

17

within a set time frame. We conclude that whether Pro Health closed the sale within a reasonable period of time is at the least a fact question.

### a. Applicable Law

The general rule is that when the parties omit an express stipulation as to time, it is in accord with human experience and accepted standards of law for us to assume that they meant whatever term of days or years might be reasonable in light of the circumstances before them at the date of the contract. *Hall v. Hall*, 308 S.W.2d 12, 16 (Tex. 1957). Said another way, when the parties to a contract do not fix the time of performance, we infer "a 'reasonable time' from all the circumstances surrounding the adoption of the agreement, the situation of the parties, and the subject matter of the contract." *Metromarketing Servs., Inc. v. HTT Headwear, Ltd.*, 15 S.W.3d 190, 196 (Tex. App.—Houston [14th Dist.] 2000, no pet.). What constitutes a "reasonable time" to complete performance depends on the facts of the case. *Id.*; *CherCo Props., Inc. v. Law, Snakard & Gambill, P.C.*, 985 S.W.2d 262, 266 (Tex. App.—Fort Worth 1999, no pet.). Ordinarily what constitutes a reasonable time is a question of fact, but when the facts are admitted or undisputed, then it becomes a question of law, which we review de novo. *CherCo Props.*, 985 S.W.2d at 266.

### b. Analysis

Here, the Listing Agreement provided various ways for Broker to earn a commission on a sale occurring during the listing period or within ninety days after the listing period terminated—though this court ruled that the latter provision is

18

ambiguous. But the Listing Agreement set forth no specific time frame for how quickly a sale should close once a buyer was procured. Consequently, Pro Health was entitled to a reasonable time to close the sale after it procured a buyer.[13]

Broker contends that Pro Health knew that it was going to sell the aircraft to the Purchaser in August 2019, that Pro Health obtained a verbal agreement for the sale, and that Pro Health gave notice in September 2019 that it was terminating the Listing Agreement. But Pro Health and the Purchaser did not enter into the Purchase Agreement until October 17, 2019. Broker claimed in its summary-judgment motion that the escrow company "was in possession of every document required to close the transaction on October 18, 2019," and similarly notes in its brief that the title company had the closing documents ready on October 18, 2019. Although Broker

---

[13]As developed more fully in its reply brief, Pro Health argues that it had no obligation to sell the aircraft and that absent an underlying obligation to sell the aircraft, Pro Health had no obligation to close within a reasonable time, thus making the "reasonable time" doctrine inapplicable. In its amended brief, it couched the issue as more of one of timing:

> [The Listing Agreement] does not, however, impose any affirmative obligation on Pro[ ]Health to expedite or complete any sale by a specific date if [Broker] did not procure a buyer. In the absence of such a provision, Pro[ ]Health had no contractual duty to close the sale before a particular deadline."

Although the Listing Agreement does not obligate Pro Health to sell the aircraft, because the Listing Agreement specifically contemplates a sale by Pro Health without setting a specific date, we assume for purposes of our analysis that it was entitled to a reasonable time to close. At this point, we resolve the issue on the basis that reasonableness is a fact question and do not opine on the question that no obligation to act within a reasonable time was imposed by the Listing Agreement.

places much emphasis on Pro Health's owner's statement that he purposely delayed the closing until after the Listing Agreement terminated, Broker makes no mention of another statement in Pro Health's owner's deposition in which he opined that the closing documents could not have been ready before October 25, 2019.[14] Nor does Broker acknowledge the statements in the emails that it attached to its summary-judgment motion showing that the funds were not placed into escrow until October 25, 2019, and that Pro Health and the Purchaser did not give written permission to close—a requirement under the Purchase Agreement—until October 25, 2019.

We must infer a reasonable time from all the circumstances surrounding the formation of the Listing Agreement. *See Metromarketing Servs.*, 15 S.W.3d at 196; *CherCo Props.*, 985 S.W.2d at 266. Following those guidelines, we conclude under the specific facts before us that Pro Health's closing the sale eight days after it entered into the Purchase Agreement and within two months of obtaining a verbal agreement for the sale—after waiting until almost all of the listing period had elapsed before entering into the Purchase Agreement—arguably constitute a reasonable time for performance. Accordingly, Broker failed to conclusively establish that Pro Health breached the Listing Agreement by allegedly delaying the closing, if it indeed did so.[15]

---

[14]To the extent these statements conflict, they create a fact issue.

[15]As explained more in our discussion of the final part of Pro Health's first issue below, the Listing Agreement's Paragraph 6(c) provided for Broker to earn its commission if the sale occurred during the ninety-day period following the listing

**3. Broker did not conclusively establish that Pro Health anticipatorily breached the Listing Agreement.**[16]

In the final part of its first issue, Pro Health argues that it did not anticipatorily breach the Listing Agreement because it did not prevent Broker from procuring a buyer during the listing period. Because Pro Health's actions did not prevent Broker from procuring a purchaser and because the Listing Agreement provided for Broker to earn a commission in the event of any sale of the aircraft within ninety days of the termination of the Listing Agreement if certain requirements were met, Broker failed to conclusively establish that Pro Health anticipatorily breached the Listing Agreement.

**a. Applicable Law**

Under the rule of anticipatory breach, the repudiation of a contract before the time of performance has arrived amounts to a breach of the entire contract and allows the injured party to immediately pursue an action for damages. *Murray v. Crest Constr., Inc.*, 900 S.W.2d 342, 344 (Tex. 1995). The following outlines the principles for when a repudiation occurs and how the allegedly nonbreaching party may respond:

period's termination if certain requirements were met, thus further undermining Broker's purposeful-delay argument.

[16]Although Broker did not plead that Pro Health had anticipatorily breached the contract, Pro Health responded to Broker's anticipatory-breach arguments in its summary-judgment response. The issue was thus tried by consent. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991) (holding that movant's unpleaded affirmative defense of no consideration was tried by consent because nonmovant failed to direct the trial court's attention to the absence of the pleading in his written summary-judgment response).

21

As a general rule, performance is excused when a party to a contract prevents the other from performing and, thereby, repudiates the contract. *Sage St. Assocs. v. Northdale Constr. Co.*, 809 S.W.2d 775, 777 (Tex. App.—Houston [14th Dist.] 1991), *aff'd in part & rev'd & remanded in part on other grounds*, 863 S.W.2d 438 (Tex. 1993). To constitute repudiation, a party to a contract must absolutely and unconditionally refuse to perform the contract without just excuse. *El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)[ (op. on reh'g)]. When one party repudiates a contract, the innocent party may treat the repudiation as a breach or continue to perform under the contract and await the time of the agreed-upon performance. *Ingersoll–Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 211 (Tex. 1999).

*Bans Props., L.L.C. v. Hous. Auth. of City of Odessa*, 327 S.W.3d 310, 315–16 (Tex. App.—Eastland 2010, no pet.).

### b.    Analysis

As briefly mentioned above, under Paragraph 3, Broker was entitled to a commission if the aircraft was sold (1) by Broker (2) during the listing period. Broker glosses over the initial requirement—a requirement that it cannot meet because it pleaded that Pro Health sold the aircraft and because the summary-judgment evidence conclusively established that Pro Health sold the aircraft. Broker instead, without specifically so stating, attempts to excuse its failure to perform its duties by arguing that Pro Health prevented Broker from performing and anticipatorily breached the Listing Agreement.

First, there is a basic disconnect in Broker's argument—how acts of Pro Health unknown to Broker impeded its ability to perform the acts that would have earned it a

22

commission or communicated that Pro Health was disavowing performance of the Listing Agreement. Pro Health crystallizes this state of affairs as follows:

> Importantly, [Pro Health] never notified [Broker] of the potential sale to [Purchaser]. Moreover, [Pro Health] did not withdraw the [a]ircraft from the market, did not refuse to allow [Broker] to show the [a]ircraft to prospective buyers, and did not take any affirmative action to interfere with [Broker]'s brokerage activities. Thus, [Broker] retained full authority under the Listing Agreement to list the [a]ircraft, solicit offers, negotiate with prospective buyers, and complete a sale throughout the entire [l]isting [p]eriod. The fact that [Broker] failed to produce a single buyer during nearly five months is attributable solely to [Broker]'s own efforts, not to any conduct by [Pro Health].

Thus, Broker has not shown that Pro Health's acts were the cause of Broker's inability to earn the commission; Broker arguably never performed the conditions necessary for it to earn a commission under Paragraph 3. To avoid the effect of its own failure to earn the commission, Broker appears to argue that Pro Health's sale of the aircraft prevented it from performing and thereby negated its ability to obtain the commission by procuring a buyer within the Listing Period. But Broker offers no proof that it had procured a buyer during that period nor proof that in any way ties that failure to Pro Health's act of negotiating its own sale or to a communication that Pro Heath was repudiating the Listing Agreement.

And Broker's argument suffers from another fatal flaw: the Listing Agreement included a provision—although determined to be ambiguous, thus preventing summary judgment—allowing for Broker to earn a commission on the sale memorialized in the Purchase Agreement if Broker met certain criteria regarding

23

negotiating with the Purchaser during the listing period. By its actions, Broker invoked that provision and did not treat the alleged repudiation as a breach but sought to rely on the continued viability of the Listing Agreement. The cited provision is the exact one that Broker relied on when it sent notice to Pro Health in an attempt to collect the commission, stating in its notice letter that as early as July 18, 2019, it had engaged in "discussions, negotiations, and communications regarding the ultimate sale of the [a]ircraft" with individuals "representing the entities who ultimately purchased the [a]ircraft." This was the basis of Broker's first summary-judgment motion. Broker cannot have it both ways. Because the Listing Agreement allowed Pro Health to engage in the exact conduct that Broker complains of— conduct that would allow Broker to benefit by earning a commission if certain requirements are met—Broker has failed to conclusively establish that Pro Health anticipatorily breached the Listing Agreement.

### 4.    We summarize our holding.

Because the summary-judgment evidence conclusively established that the aircraft's sale occurred after the listing period had terminated and because Broker did not conclusively establish that Pro Health had purposedly delayed closing the sale of the aircraft or that Pro Health had anticipatorily breached the Listing Agreement, we hold that Broker did not conclusively prove that Pro Health breached the Listing Agreement by refusing to pay Broker a commission and that the trial court erred by

24

granting Broker summary judgment on its breach-of-contract claim. Accordingly, we sustain Pro Health's first issue.[17]

## IV. Conclusion

Having sustained Pro Health's first issue, which is dispositive of this appeal, we reverse the trial court's October 21, 2025 final judgment and remand the case for further proceedings consistent with this opinion. *See* Tex. R. App. P. 43.2(d).

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: June 25, 2026

---

[17]In its second issue, Pro Health argues that the trial court erred by incorporating the reversed 2023 final judgment into its 2025 final judgment. Because we are reversing the 2025 final judgment, we need not reach this issue. *See* Tex. R. App. P. 47.1. *See generally In re A.H.S.*, 676 S.W.3d 355, 363 n.6 (Tex. App.—Tyler 2023, pet. denied) ("The effect of an appellate court's reversal of a trial court's decision is to nullify the judgment of the trial court, leaving it as if it had never been rendered.").